271 So.2d 148 (1972)
Wade KILGORE, Appellant,
v.
STATE of Florida, Appellee.
Nos. 70-898, 70-899.
District Court of Appeal of Florida, Second District.
December 1, 1972.
Rehearing Denied January 22, 1973.
*149 T. David Burns, Bartow, for appellant.
Robert L. Shevin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., Tallahassee, for appellee.
PIERCE, Chief Judge.
Appellant Wade Kilgore appeals to this Court from separate judgments and sentences entered against him in two cases which were consolidated by the trial Court for purpose of trial.
Direct informations were filed against Kilgore in the Polk County Criminal Court of Record, charging him respectively with second degree murder and carrying a concealed firearm. Upon being arraigned he entered a plea of not guilty to each information. Trial by jury was set for October 6, 1970 by separate trial orders. On the latter date the Court, over objection of Kilgore's counsel, ordered the empaneling of a single jury to try jointly the two informations, and they were so tried.
During the afternoon of the first day's trial an unusual and unfortunate occurrence happened when the young four year old son of Kilgore's trial counsel, T. David Burns, had a certain accident at his home. A recess of trial was declared during which attorney Burns endeavored to get medical aid for his son. After again convening in Court, counsel renewed his request for an additional temporary suspension of the trial but the trial Judge, after several frustrating opinions in the matter, finally ordered the trial to proceed, which it did into a late night session, lasting until the following morning.
Also, Kilgore sought a jury instruction on self-defense but the Court refused such request.
There were other contentions of error made at the trial, and later here, but the foregoing constitute the material arguable points raised on behalf of Kilgore which we will briefly discuss here seriatim. They are: (1) was it proper for the trial Court to force Kilgore to defend before the same jury, in a joint trial, two separate informations charging separate and distinct felonies?; (2) should the trial Judge have instructed the jury on self-defense?; and (3) in the light of the facts then existing, should not the trial Judge have recessed further trial for the night of October 6, 1970?

(1) Was a forced joint trial under the circumstances proper?

We think not.
Information in our appeal No. 70-898 charged that Kilgore unlawfully had and carried "on and about his person concealed, a deadly firearm, to-wit, a pistol ..." without legal authorization. The other information in our appeal No. 70-899 charged Kilgore with the second degree murder of one Nathaniel McFadden pursuant *150 to an assault upon McFadden "with a deadly weapon, to-wit: a pistol". Both informations were filed directly in the Polk County Criminal Court of Record by the County Solicitor without intervention of the grand jury, on May 11, 1970.
On June 10, 1970, separate arraignments and entries of pleas of not guilty to each information were entered, and jury trial in each case was set for October 6, 1970. On October 6th, at the beginning of the session when the Court was apparently preparing for a joint trial, Kilgore's counsel stated "he was surprised at going to trial on two separate and distinct cases. Any reference to the second separate and district felony would cause a prejudice against the defendant in the trial of murder in the second degree that no admonition or charge of the Court could overrule. We state that he is not charged in a two count information so the defense was not on notice the two cases would be tried together." The prosecutor then interposed that "both of these cases have been notified (sic) for trial ...". The Court stated that "it would not be prejudicial in any way because the question of a firearm would come out necessarily in the testimony as a part of the other offense ... I see no reason any way why the two couldn't be tried together ... If they had been tried on a two count information you would have exactly the same situation." Reminded by Kilgore's counsel that "carrying a concealed weapon is not a lesser included offense in a crime of murder in the second degree" (to which the prosecutor and the Court readily agreed), the trial Judge ruled: "Note the motion. You have it for the record. Motion is denied."
The consolidation of two or more separate criminal charges is not a matter of right by either party. It must be properly moved for in an orderly fashion by the party so desiring it, either the State or the defendant. This is implicit in CrPR 1.190(k), 33 F.S.A., as follows:
"(k) Motion for Consolidation. Upon motion of the State or a defendant, the court may order two or more indictments, informations or affidavits to be consolidated for trial, if the offenses, and the defendants if more than one, could have been joined in a single indictment, information or affidavit. The procedure thereafter shall be the same as if the prosecution were under a single indictment, information or affidavit."
It will be observed that under the Rule two things must concur for a trial consolidation to be effective, namely, it must be upon motion of a party to the cause and it must be ordered by the Court; and then only "if the offenses ... could have been joined in a single ... information ..." It is somewhat the antithesis of a severance, or motion for severance, which is dealt with in subsection (g) preceding the consolidation Rule.
In the case sub judice, so far as the record shows, no motion for consolidation was made by anybody. Apparently, the first either party, certainly the defendant, knew that the trial Court had in mind to consolidate the two cases was when Court convened the morning of the trial. And, from the transcribed proceedings, when it became apparent that the two cases were intended by the Court to be tried together Kilgore, through counsel, timely objected and moved for separate trials, which motion was denied. And the cases then proceeded to trial jointly before the same jury, resulting as hereinafter mentioned in an aggregate sentence of 30 years in the penitentiary, 20 years in one case and 10 years in the other, to run consecutively. This was procedural error to a prejudicial degree.
This is not to say that a consolidation of two or more criminal charges, even felonies, contained in separate indictments or informations, should not be consolidated for trial under proper circumstances. It is often done with impunity by agreement of the parties. And it might be *151 done by order of Court over objection of one or the other of the parties, when properly allowable. But when it is imposed upon a party, particularly the defendant over his objection, and where there might conceivably be cogent and compelling reasons inveighing against such consolidation, we have an entirely different situation. Under such circumstances the Court should be rather chary in ordering a defendant to stand trial upon two joined felonies before the same jury.
There are salutary reasons for this. One important reason that comes readily to mind is the question of whether the defendant should take the witness stand in his own behalf. Experienced trial lawyers have always realized that this sometimes becomes one of the most critical and momentous decisions to be made in the course of a criminal trial. By taking the witness stand a defendant automatically subjects himself to cross-examination. And in a consolidated trial this might in turn subject him to such cross-examination on all the charges then being tried. It could well be that in the trial of case A, if not so joined, it might be strategic from the defendant's standpoint that he not voluntarily testify. But he would be caught in an inescapable vise if he was forced to take the stand in a consolidated trial, to protect his interests in case B, and thereby suffer the disadvantages in case A as mentioned. In fact, a practical illustration of being forced to choose between two horns of the dilemma arose in the instant case, when Kilgore's counsel was constrained to put him on the witness stand in his own behalf in an effort to produce a factual basis for self-defense to the homicide charge, when by doing so he ipso facto was forced to virtually admit he was carrying a concealed weapon, which was the gravamen of the other charge.
Another incident of prejudice arising from a forced trial consolidation could arise, and has in fact actually arisen, in the matter of determining the number of peremptory challenges allowable to a defendant in such consolidated trial. See Meade v. State, Fla. 1956, 85 So.2d 613, 59 A.L.R. 2d 835; Johnson v. State, Fla.App. 1968, 206 So.2d 673; Johnson v. State, Fla. 1969, 222 So.2d 191; and McCoy v. State, Fla. App. 1965 (2nd District) 175 So.2d 588. It is unnecessary to pause here to review these cited cases as the opinions therein speak for themselves.
A circumstance illustrating in stark focus the harmful consequences possible in even a procedural departure from the norm is shown in the instant appeals.
After trial, the jury returned separate verdicts finding Kilgore guilty in case No. 70-898 of carrying a concealed firearm and guilty in case No. 70-899 of murder in the 3rd degree. Upon the latter information, wherein Kilgore was convicted of 3rd degree murder, the trial Judge sentenced him to 20 years in the State Prison, the maximum allowable on October 28, 1970, at the time it was pronounced, although since then, as of January 1, 1972, such maximum sentence for 3rd degree murder has been reduced to 15 years imprisonment. F.S., §§ 782.04 and 775.082 F.S.A. In the former information, carrying a concealed firearm, the trial Judge sentenced Kilgore to serve 10 years in the State Prison, to run consecutively with the other 20 year sentence, making a total prison sentence of 30 years. (The 10 year sentence, on its face, is excessive under State law, which prescribed a maximum imprisonment in the State Penitentiary of not exceeding five years. See F.S., §§ 790.01(2) and 775.082(4)(c) F.S.A.).
We concede the question of consolidation is a close one, as is always the case when a wide discretion is reposed in the trial Judge. But inasmuch as the cases must be reversed upon other grounds, we suggest that in any retrial the cases be tried separately, if still so desired.

(2) Refusal to instruct jury as to self-defense.

In case No. 70-899, the information charged that Kilgore committed second degree *152 murder in that he unlawfully assaulted Nathaniel McFadden by shooting him with a pistol. During the course of the trial, counsel for Kilgore sought on numerous occasions to adduce evidence as to the unsavory reputation and the propensities for violence on the part of McFadden, and evidence generally of his turbulent and dangerous character and reputation for violence and physical malignity. For instance, cross-examination of State witness Charles Smith adduced the fact that McFadden was known to carry a gun  "Not always, but I know I have seen him with one quite a few times". Police officers in Lakeland had had previous trouble with him but when defense counsel attempted to explore the subject more fully the Court sustained the State's objection "unless the proper predicate was laid ... it would not be a matter the jury would be concerned in determining the issues in this case".
There was testimony as to some physical shoving between Kilgore and one Coffee, McFadden's brother-in-law, the evening of the fatal encounter, February 22, 1970, during which the Court admonished Kilgore's counsel to "quit interrupting him [the witness Coffee] you are putting words in his mouth", to which counsel replied that he was merely trying to exemplify to the jury the facts as to the physical shoving. The Court then stated "I don't know how to do it very well unless you give him [defendant Kilgore] a pistol." It was immediately developed through the witness himself that Kilgore had no "pistol in his hand at the time he shoved McFadden". The defense then moved for a mistrial, on the ground that the Court's statement "was highly inflammatory and improper". The trial Judge denied the motion, observing that "the Court will determine what's improper".
Testifying in his own behalf, Kilgore said he had seen McFadden carrying a gun on occasions. On the night in question McFadden and Kilgore were having an argument with reference to McFadden shoving Kilgore's brother on a table; that Kilgore objected to such shoving, to which McFadden responded "What do you have to do with it?" Kilgore then said "I told him he was my brother. So ... he started on me so I pulled the gun ... he went for me, grabbed me, man-handled me, I guess ... I jumped back and pulled the gun". Kilgore stated that McFadden then "went back of the counter" and he, Kilgore, started out the front door with one M.C., his brother, whereupon "everybody started screaming" and "when I turned around Mac [McFadden] was coming out of his back pocket and he was as close to me as that table and when I turned... he was coming running" toward Kilgore, with his hand "coming up ... I had the gun in my hand so I just shot ... I was ... in fear of Nathaniel McFadden".
Kilgore's counsel requested a charge on self-defense, which the Court refused to give. While the evidence may not have been too strong as showing or tending to show self-defense, yet we think in fairness to the defendant on trial for two serious felonies the charge should have been given for what it was worth. It is not the quantum or the quality of the proof as to self-defense that determines the requirement for giving the charge. If any evidence of a substantial character is adduced, either upon cross-examination of State witnesses or upon direct examination of the defendant and/or his witnesses, the element of self-defense becomes an issue, and the jury, as the trier of the facts, should be duly charged as to the law thereon, because it is the jury's function to determine that issue.
One of the elements entering into the question of self-defense, as hereinbefore adverted to, is the matter of the character and reputation of the victim for physical violence and turbulence. The case of Garner v. State, (1891) 28 Fla. 113, 9 So. 835, undoubtedly remains the landmark case in Florida on this subject. While it is *153 of ancient vintage, yet apparently it has withstood the ravages of time and is still the law. As stated in that recognized encyclopedia, 1 A.L.R. 3rd at page 586:
"In Florida it has been recognized that in a homicide prosecution in which the accused contends that he acted in self-defense, a foundation for the introduction of evidence of the violent character of the deceased must be laid by evidence of some overt act or demonstration on the part of the deceased, which, though considered apart from the dangerous character of the deceased would be regarded as innocent or harmless, when received and considered in connection with, or illustrated by, such character, could arouse a reasonable belief of imminent peril of loss of life or great bodily harm. It has also been recognized that the foundation for the introduction of evidence of the dangerous character of the deceased may be laid by the testimony of the accused himself, unsupported by other testimony." Citing Garner, Hart v. State, (1896) 38 Fla. 39, 20 So. 805; Allen v. State, (1896) 38 Fla. 44, 20 So. 807.
And continuing in 1 A.L.R. 3rd 574:
"... in trials for homicide ... in which the defendant admits the killing ... and claims to have acted in self-defense, evidence of the turbulent and dangerous character or reputation of the deceased or the victim of the assault is relevant, since the law recognizes the well-established fact in human experience that the known reputation or character of an assailant as to violence and turbulence has a very material bearing on the degree and nature of the apprehension of danger on the part of a person assaulted."
This 2nd District Court, in Parrish v. State, Fla.App. 1959, 113 So.2d 860, reversed a conviction for second degree murder because of error of the trial Judge in refusing a self-defense instruction. We quote from our opinion in Parrish, quoting in turn from the Supreme Court opinion in Barnes v. State, Fla. 1957, 93 So.2d 863, 864:
"It is well settled that `where the evidence is inconclusive or conflicting, the failure of the trial judge to provide a charge which lays down standards for the jury to follow under varying permissible views of the evidence constitutes reversible error.' Holley v. Kelley, Fla. 1957, 91 So.2d 862, 864, and cases cited. Nor is there any legal principle more firmly established in our system of jurisprudence than that, which makes the jury the sole arbiter of the credibility of the witnesses (except where contrary to demonstrable physical facts) including the reasonableness, probability and credibility of the testimony of the defendant. Cf. Tidwell v. State, 143 Fla. 397, 196 So. 837.
* * * * * *
Regardless of how improbable the defendant's testimony was, it certainly was not demonstrably false, and as our Supreme Court did in the Barnes case, we must hold that the trial Court erred in refusing a self-defense instruction."
Accord: Motley v. State, (1945) 155 Fla. 545, 20 So.2d 798; Bagley v. State, Fla. App. 1960, 119 So.2d 400.
While the question in the instant case is not entirely free from doubt we are inclined to the view that the refusal of the eminent trial Judge to recognize completely the existence of self-defense as an issue in the case, and instruct the jury accordingly, was error.

(3) The night session.

At about 3:30 P.M. on the first day of trial, October 6, 1970, the trial Judge announced to the jury as follows:
"We will take a little recess now. Mr. Burns [defense counsel] has received word his son has fallen and hurt himself and he wants to see how badly he is hurt and all. So we will take a little recess while he makes arrangements to take him to the doctor to check him."
*154 About 6 P.M. thereafter Burns made the following report to the Court:
"At approximately 3:30 today the prosecutor brought me a note that my wife had called and stated that my son had been injured. The Court and prosecutor and everyone concerned was courteous enough to allow me to leave. I'd like the record to reflect after leaving I called back at approximately 25 minutes later from the doctor's office and reported that the boy hadn't been seen at that time; called back approximately 20 minutes after that and reported they were taking x-rays and the doctor said it would be about 40 more minutes before he read them and could tell me if anything was wrong with the boy. I can state to the Court since that time the doctor has read the wet x-rays and has stated to me that he doesn't think he has a fracture. However, he said through an abundance of caution to put the baby to bed, which I have done, this is a four year old child, our only boy, I have bathed him and put him to bed. If he fell (asleep) to wake him every hour, watch him through the night. For the purpose of the record, Your Honor, I would like to reflect to you I feel I have been kicked in the pit of my stomach. I am upset, distraut. It is now 6:00 o'clock. For the last two and a half hours this personal thing involving my child has distracted me from the course of this case and still not knowing for certainty I state candidly to the Court I trust and hope nothing is wrong with the child. It is still in my mind, and through an abundance of caution with the defendant in mind, his good defense, I would request this case be recessed until in the morning. If it is continued now at 6:00 o'clock in the evening, having gone through what I have recited to the Court, I would object to being forced or placed into further trial at this point. I know many courts have crowded dockets and cases take two weeks, two days, two months, and this is one of the pit falls of our system of jurisprudence but I feel candidly as an attorney for this defendant, I cannot devote my best effort at this time. I feel I can in the morning. I told the Court that I don't think there is anything seriously wrong, but the doctor has told me to place him in bed and wake him every hour and this is on my mind. I think it will distract me from proper defense in this case and I would request that we be allowed to continue in the morning rather than now at 6:00 o'clock in the evening. I can further state that defense counsel hasn't eaten; during the last two and a half hours I have not had the time to devote to the case which normally I would be devoting to this case because of the personal matters as the Court knows."
There then followed a somewhat harrying colloquy between counsel, with the prosecutor objecting to further delay and insisting the trial proceed and defense counsel insisting that in his troubled mental condition and worry over his son's condition it would not be fair to himself or his client to endure a night session. During the ensuing verbal palaver it seemed fairly agreed that the instant case could be reasonably concluded the following day, allowing time out for trial of a traffic case. The trial Judge then observed that "I think under the circumstances we will, let's come in at 9:00 o'clock in the morning", observing further that "I know in Mr. Burns' case I would not feel like carrying on. I can sympathize. I want to continue the case. I am afraid under the situation it would be error to refuse a request like that under those circumstances." It then developed that the prosecutor was normally in attendance in that Court only one day a week which would additionally complicate the next day's proceedings. Finally, after further discussion, the Court decided to continue with the trial that night, and we quote additionally from the transcript:
"THE COURT: Well I have been here to 6:00 o'clock the next morning. I don't like to do it, but when the work of *155 the court demands it, I will stay here all night if it is necessary.
I'd like to go home since this is my 52 wedding anniversary.
Well, let's proceed then, gentlemen. I will deny the request and see how far we can go."
It was shortly after 6 o'clock P.M. when the trial recommenced. At 12:22 A.M. the following morning, the jury returned its verdicts of conviction.
While the situation confronting the Court at 6 P.M. was admittedly one of discretion as to whether to recess or continue under all the circumstances aforesaid, it is our considered opinion that the Court abused its discretion in forcing defense counsel in his distraught mental condition to keep trying the case for half the remaining night until it was finished.
In the first place, Courtroom trials should not be conducted at all in the night-time, except in cases of necessity bordering upon an emergency. Particularly is this true when the defense lawyer is perforce handling his case alone and has already been engaged in it during the day  and where it is a criminal trial involving two consolidated felonies  and where, added to all this is the fact that, even under ordinary circumstances, the defense lawyer, shouldered with the awesome responsibility of his client's fate, could not possibly do justice in attempting to discharge that responsibility in his current mental upset due to his young son's unfortunate injury.
And if, by some process of abstruse reasoning the standing of defense counsel to object to such procedure be discounted, certainly the rights and standing of the prisoner in the dock, the forgotten man Kilgore, should have been considered. After all, he was the one who had most at stake. There might be significance in the fact that some six hours after the trial was resumed that evening the jury brought in verdicts that produced thirty years in the penitentiary for Kilgore. We might well interpolate here that, in this land where liberty is built upon organic fundamentals of equal justice and due process, it doesn't matter whether your skin is white, black, yellow, or variegated, or whether you are Indian, Eskimo, or Mongolian  or for that matter, whether in point of fact you are guilty or innocent of what you are being tried for  you are still constitutionally entitled to a fair trial upon established principles of law and justice. One of the basic precepts of a fair trial is the right to be represented in Court by competent counsel who can discharge his duty without carrying the burden of a figurative straight jacket  mental or otherwise.
For the foregoing reasons, the judgments appealed are severally reversed and the causes remanded for further proceedings not inconsistent herewith.
LILES and MANN, JJ., concur.