402 So.2d 365 (1981)
William Thomas ZEIGLER, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 50355.
Supreme Court of Florida.
June 11, 1981.
Rehearing Denied September 18, 1981.
*367 H. Vernon Davids of the Law Offices of H. Vernon Davids, Winter Garden, for appellant.
Jim Smith, Atty. Gen. and Richard W. Prospect and Gregory C. Smith, Asst. Attys. Gen., Tallahassee, for appellee.
ADKINS, Justice.
This is an appeal from two judgments of murder in the first degree, two judgments of murder in the second degree, two sentences imposing the death penalty and two sentences of life imprisonment. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. (1972).
On Christmas Eve, December 24, 1975, Eunice Zeigler, wife of defendant (hereinafter referred to as wife), and Perry and Virginia Edwards, parents-in-law of defendant (hereinafter referred to as Perry and Virginia), were shot to death in the W.T. Zeigler Furniture Store in Winter Garden, Florida. In addition, Charles Mays, Jr., (hereinafter referred to as Mays), was beaten and shot to death at the same location. Times of death were all estimated by the medical examiner as within one hour of 8:00 P.M. The defendant was also shot through the abdomen.
The state's theory of the case may be summarized as follows:
Edward Williams had known defendant and his family for a number of years. Williams testified that in June 1975 defendant inquired of him about obtaining a "hot gun." Williams then went to Frank Smith's home and arranged for Smith to purchase two RG revolvers. The revolvers were delivered to defendant. Also, during the latter part of 1975 defendant purchased a large amount of insurance on the life of his wife. Thus was shown the means and the motive.
Mays and his wife came to defendant's furniture store during the morning of December 24 and Mays agreed to meet defendant around 7:30 P.M. The store was closed around 6:25 P.M.
Mays left his home around 6:30 P.M. He went to an Oakland beer joint and saw a friend, Felton Thomas, who accompanied Mays to the Zeigler Furniture Store.
The theory of the state's case is that defendant had two appointments on Christmas Eve, one with Mays and one with Edward Williams. Prior to these appointments he took his wife to the store and in some manner arranged for his parents-in-law to go there. He killed his wife, Eunice, quickly, and for her, unexpectedly, since she was found with her hand in a coat pocket, shot from behind.
Because of the location of her body, Virginia was probably trying to hide among the furniture. Perry probably surprised defendant with his strength and stamina as they struggled for some time. After defendant subdued Perry and rendered him harmless, defendant shot him. Considering the fact that a bullet penetrated Virginia's hand, the state said it was likely she was huddled in a protective position when she was executed.
Defendant then left the store, returning to meet with Mays who had arrived there at *368 about 7:30. He was probably surprised to see the presence of another man, Felton Thomas, with Mays. He took Thomas and Mays to an orange grove to try the guns. The state says that the purpose of the trip was to get the two to handle and fire the weapons in the bag. From the grove he returned to the store, but was unsuccessful in getting Mays or Thomas to provide evidence of a break-in. He did, however, get Thomas to cut off the lights in the store. The three returned to defendant's home. Defendant got out, went to the garage, came back and took a box of some kind to Mays and told him to reload the gun. They returned to the store. Defendant could not persuade Thomas to enter the store, so Thomas lived. When Thomas disappeared, the defendant returned to his home and picked up Edward Williams. Defendant had killed Mays.
Defendant was successful in getting Williams partially inside the back hallway. Defendant put a gun to Williams' chest and pulled the trigger three times, but the gun did not fire. Williams said, "For God's sake, Tommy, don't kill me," and ran outside, refusing to return to the store. The state says that the empty gun was as much a surprise to defendant as it was to Williams. The state says that in all probability defendant thought he was holding the gun that Mays had shot in the orange grove and which defendant told Mays to reload.
When he was unable to get Williams into the store, the defendant became desperate and conceived the idea that he would appear uninvolved if he happened to be one of the victims. Accordingly, he shot himself and then called Judge Vandeventer's residence where he knew the police officers would be.
The defendant denies that he had any contact with Smith or purchased any guns from him. He says that the increase in the amount of the insurance policy was pursuant to advice on an estate plan. Defendant says that his wife, Perry, and Virginia were killed during the course of a robbery; that Mays was involved in the robbery but was killed by his confederates; that he was shot by the burglars and left to die. The jury obviously did not believe the testimony of the defendant. To have believed his story, the jury would necessarily have had to disbelieve the testimony of Smith, Thomas, and Williams and would have had to have found no significance in the other substantial evidence.
We have carefully examined the extensive record and find that there was substantial evidence upon which the jury verdict could be based, and we find that the evidence was sufficient to sustain the verdict.
The defendant was arrested in his hospital room on December 29, 1975, a preliminary hearing was held January 16, 1976, and the grand jury returned indictments on March 26, 1976. One indictment charged defendant with three counts of first degree murder for the shooting deaths of Eunice Zeigler, Perry Edwards and Virginia Edwards. Another indictment charged defendant with one count of first degree murder for the beating death of Charles Mays, Jr.
An order was filed by the trial court on April 1, 1976, wherein the court advised counsel of his desire to consolidate the two indictments for trial. This order contained the following:
Based upon representations and discussions between the Court and the Attorneys involved concerning anticipated length of time of the trial and the number of witnesses being spoken of on each side that will be called both in presentation of the State's case as well as in defense, which assertions or representations have gone into the hundreds, and due to the apparent similarity in circumstances surrounding the events leading up to the charges in both of these cases, and considering the expense both to the State and to the defense in two identical trials, this Court is considering entry of an order consolidating the two indictments for a single trial. The purpose of this Order is to so notify counsel of the Court's thoughts at this time and by this Order directing that the parties file with *369 this Court, within 15 days from the date of this Order, the objections, if any they have to such a consolidation for purposes of trial and that such objections, if any, should be specific and should point out the prejudices, if any that would result to either the State or to the defendant in such a consolidation.
In its response the state made no objection to the consolidation of the cases and alleged:
1. The facts and circumstances surrounding the deaths of those persons alleged to have been murdered in Indictment 75-3564 would be relevant, material and competent evidence in the trial of that homicide charged against the defendant in Indictment 76-779, and vice versa.
2. In the trial of either indictment all of the surrounding circumstances of all of the homicides would be lawfully and probably necessarily made known to the jury.
3. That all of the homicides alleged in the two said indictments were committed during the evening of December 24, 1975, in the same building situate in Winter Garden, Orange County, Florida, and the facts surrounding the same are interwoven and connected with one another.
The defendant in his response objected to the consolidation and alleged:
1. The three homicides alleged in Indictment No. CR 75-3564 are alleged to have occurred through gunshot wounds while the one homicide alleged in Indictment No. CR 76-779 is alleged to be death caused by a blunt instrument.
2. It is the defense's understanding that while the homicides alleged in the two separate indictments are supposed to have occurred during the evening of December 24, 1975, that the proofs that deaths occurred at separate and distinct times with the homicides alleged in CR 75-3564 occurring at one period of time and the alleged homicide in CR 76-779 occurring at a later time.
3. The defense is not yet in possession of sufficient facts and information to determine all paths to be followed by the defense in these cases, but it remains a distinct possibility that self-defense will be asserted to response to the charges contained in Indictment No. CR 76-779.
4. For the foregoing reasons and upon the legal precedents enunciated by this Honorable Court in its Order and specifically based upon Meade v. State, 85 So.2d 613 (Fla. 1956), the defense does hereby interpose its objection to any consolidation of these two indictments for trial.
The court then entered its order consolidating the indictments for purposes of trial and all future proceedings. The order contained the following:
THIS COURT, in exercise of its inherent power, entered its Order dated April 1, 1976, pertaining to possible consolidation of Indictment 76-779 and 75-3564; both the State and Defendant have filed their response to that Order. In his response, the Defendant has neither claimed, or shown, any prejudice that would result to him from the consolidation.
In entering this Order, the Court has considered the cases cited in the prior Order, plus the following ABA Standards:
1. The Administration of Criminal Justice, Joinder of Offenses and Defendants, § 3.1,
2. Joinder and Severance, § 3.1,
3. The Function of the Trial Judge, §§ 3.8, 3.9.
Florida Rule of Criminal Procedure 3.151(b), in effect at the time of trial, provided as follows:
(b) Two or more indictments or informations charging related offenses shall be consolidated for trial on a timely motion by a defendant. The procedure thereafter shall be the same as if the prosecution were under a single indictment or information. A defendant's failure to timely move for consolidation constitutes a waiver of his right to consolidation. (Emphasis added).
*370 The defendant says that the consolidation of the two indictments over his objections was erroneous in that it was contrary to the provisions of this rule. In support of his contentions the defendant cites Belote v. State, 344 So.2d 565 (Fla. 1977), which was not available to the trial judge when he entered his ruling. In Belote three separate informations charging three separate offenses were filed against the defendant. Trial for the three cases was set by separate order on the same date. On the day of trial the defendant first learned that all three cases had been consolidated sua sponte, and objected to such consolidation. The Court in Belote, referred to Kilgore v. State, 271 So.2d 148 (Fla. 2d DCA 1972). In Kilgore the defendant was charged by separate informations with second degree murder and carrying a concealed weapon. On the day of trial, the trial court consolidated the cases without motion being made by either of the parties. The defendant objected to the consolidation on the basis of surprise, and the fact that the separate concealed weapons charge would prejudice him with regard to the second degree murder charge. The Court reasoned that when a consolidation of separate and distinct charges is forced upon a defendant over his objection, there conceivably might be cogent and compelling reasons inveighing against the consolidation. This Court in Belote relied upon Kilgore to hold that Belote was denied substantial procedural rights of consolidation over her objection on such short notice.
Buttressing its holding, this Court in Belote made reference to the fact that the rule in effect at the time of Belote's trial allowed consolidation only upon a defendant's motion.
Unlike the situation in Belote, supra, and Kilgore, supra, no short notice or surprise is present in this record. Technically speaking, the court violated the provisions of the rule when the indictments were consolidated by the court on its own motion. However, resolution of this issue must be made in light of demonstrated prejudice resulting from the consolidation. Neither in the trial court nor on appeal has the appellant shown any prejudice. He had full knowledge of charges he had to defend against at trial and the time between consolidation and trial represented several months. There is no doubt that even if the cases had been tried separately, there would have been no difference in the state's evidence. In other words, to have proven one case was to have proven the other.
After examination of the entire record it does not appear that this error injuriously affected the substantial rights of the defendant. Therefore, the judgment should not be reversed upon this ground. § 924.33, Fla. Stat. (1979).
Defendant next contends that the failure of the trial court to grant any of his motions for continuances was a denial of adequate time to prepare a defense and a denial of due process. Generally, the action of the trial court on a motion for continuance will not be disturbed on appeal unless there has been a palpable abuse of discretion. Mills v. State, 280 So.2d 35 (Fla. 3d DCA 1973).
The thrust of the requests for continuances was essentially that defendant needed more time to prepare his defense. However, in his motion for continuance the defendant consistently and expressly refused to waive his right to a speedy trial. If a continuance is granted upon the motion of the defendant the speedy trial time is tolled. State ex rel. Butler v. Cullen, 253 So.2d 861 (Fla. 1971). Obviously the defendant was seeking an extension of time but wanted the trial to be held within the 180-day period specified by the speedy trial rule. Fla.R.Crim.P. 3.191. The trial began on June 1. There were only twenty-one days within the speedy trial time in which the trial could have taken place had the continuance been granted. It is clearly established that the decision to grant or deny a motion for continuance is addressed to the sound discretion of the trial court. Durcan v. State, 350 So.2d 525 (Fla. 3d DCA 1977). The record does not show an abuse of discretion, so this contention is without merit.
*371 Defendant next complains about four separate searches. On the night of the homicide, Officer Yawn was sent to defendant's house by Chief Don Ficke. At the time Ficke had knowledge that the defendant had been involved in a shooting at the store and the officers had a reasonable belief to suspect foul play. The officers certainly had reason to believe that the other members of the family had been involved in some foul play. The officers wanted to determine the location or whereabouts of Eunice and her parents. They arrived at the house and no one was there. The reasonableness of an entry by the police upon private property is measured by the totality of existing circumstances. The right of police to enter and investigate an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers and derives from the common law. See United States v. Herndon, 390 F. Supp. 1017 (S.D. Fla. 1975); State v. Hetzko, 283 So.2d 49 (Fla. 4th DCA 1973); Webster v. State, 201 So.2d 789 (Fla. 4th DCA 1967). The officers arrived at the house and when there was no response, they acted reasonably in entering the house to determine whether any foul play had occurred and to locate Eunice Zeigler and her parents. After finding no one in the house, the officers proceeded to the garage and observed a car belonging to Curtis Dunaway. It was reasonable for the officer to look inside the automobile to see if it contained any evidence of wrongdoing. It was reasonable for the officer to seize the gun located on the rear floor of the automobile which was parked in the garage.
The second search of the house, which defendant says was illegal, was conducted in the early morning of December 25, 1975. The trial court found that this search was a result of a valid consent given by the defendant. Nurse Clark testified that Detective Frye asked her to tell defendant what the consent was, to read it to him, and have him sign it. She read the document to the defendant, asked him if he understood it, and defendant stated that he was willing to sign it. She testified that defendant was alert and that his answers were responsive to questions she asked him. Another nurse testified that at the time defendant was coherent and conscious. There exists in the record clear testimony regarding defendant's mental condition at the time he signed the consent form. The record fully supports the determination of the trial judge that the consent was voluntarily given. See Bailey v. State, 319 So.2d 22 (Fla. 1975); Reddish v. State 167 So.2d 858 (Fla. 1964).
Defendant also assigns as error the order of the trial judge denying his motion to suppress certain items found in the store where the homicides occurred. The trial judge found:
The evidence is unequivocal that the defendant himself called the police to the store; that there were four dead bodies at the store; that the police were in process of conducting a crime scene investigation which, due to its complexity, continued for more than a week; that the police were legally upon the premises carrying out their required duties. There was nothing illegal or unlawful in so investigating the scene which would require the items taken be suppressed.
If the police officers had gone to the store for a reason other than defendant's invitation, they would have been perfectly entitled to look inside to ascertain the need to offer immediate aid or to see if a killer was still on the premises. In the course of this activity they would have likewise been permitted to seize all evidence that was in their plain view.
Defendant relies upon Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The Supreme Court of the United States held that there is no such thing as a crime-scene exception to the Fourth Amendment. The Court acknowledged, however, the right of police officers to respond to emergency situations and the Fourth Amendment does not bar police officers from making warrantless entries when they reasonably believe that either a person within is in immediate need or to see if a killer is still on the premises. The police *372 may seize any evidence that is in plain view during the course of their legitimate emergency activities.
In the case sub judice, the police were at the store as a result of the invitation of the defendant. That invitation removed any application of Mincey. Also, the trial judge did not base his ruling on a construction of the Fourth Amendment. The above quoted portion of his order reflects that the basis of the ruling is the fact that defendant called the police to the store. The trial court did not commit error in denying the motion to suppress the items which were found and seized during the officer's presence in the store.
Defendant next contends that the trial court committed reversible error by admitting, over defendant's objection, evidence in violation of Florida Rule of Criminal Procedure 3.220 relating to discovery. Witness Delaney was called as a defense witness out of turn and testified that he examined photographs of the bloody footprints, the shoes of defendant, and comparison prints. Although there were general characteristics of similarity, as an expert he could not find any specific points of identification. He concluded that the prints in question could have been made by defendant's shoes but he could not positively state that the shoes did in fact make the print. At defendant's request, Witness Delaney was excused from further attendance.
The state then called Professor McDonnell as a witness. He testified that he conducted experiments with the shoes. Defendant then objected to any testimony relative to such tests on the basis that he had received no report or any indication that such tests had been conducted. In support of his objection the defendant relies upon Cumbie v. State, 345 So.2d 1061 (Fla. 1977) where the existence of statements made by a defendant was not disclosed during depositions taken by the defense of two officers who were called as witnesses by the state, and no inquiry was made into the prejudice resulting to the defendant. The court held that reversible error was committed.
A trial court has discretion in determining whether non-compliance with the discovery rule results in harm or prejudice, but that discretion can be properly exercised only after the court has made an adequate inquiry into all of the surrounding circumstances. Leeman v. State, 357 So.2d 703 (Fla. 1978). When the trial court, sub judice, became aware that a non-disclosure had occurred, it inquired of the defendant how long he wished to examine Witness McDonnell and his evidence. Defendant replied at least thirty minutes. Trial was recessed and apparently defendant received the time he requested.
The failure to observe and comply with the rule of discovery should be remedied in a manner consistent with the seriousness of the breach. Cooper v. State, 336 So.2d 1133 (Fla. 1976). Here Witness Delaney had testified that he performed the tests with shoes using printers ink, while Witness McDonnell performed tests using human blood. Defendant claimed that he had not known about or seen the experiment regarding the shoe prints made in blood. The obvious remedy consistent with the breach would be to allow him the necessary time to do so. The trial judge did this. This case is remarkably different from Cumbie, where the prosecution responded falsely to a demand for discovery. When it proposed to introduce testimony contrary to that response, the trial court failed to make any inquiry and failed to afford any remedy to the defendant. In contrast, the facts sub judice, clearly show that the state did not falsely respond to a discovery demand but rather failed to disclose the fact that Witness McDonnell had performed experiments during the course of the trial. A remedy was afforded and defendant then became aware of what Witness McDonnell had done. Actually, there was very little contradiction between the testimony of Delaney and the testimony of McDonnell. The failure of the state to observe and comply with the rule of discovery was remedied in a manner consistent with the seriousness of the breach and the trial judge did not commit reversible error in admitting this evidence.
*373 The defendant argued that the trial judge committed reversible error in admitting certain fingerprint evidence as well as in admitting into evidence a bullet reportedly taken from an orange grove where defendant is alleged to have taken Thomas and Mays to fire guns. His argument is based upon the principle that fingerprint evidence is inadmissible unless the circumstances are such that the print could have been made only at the time the crime was committed, citing Knight v. State, 294 So.2d 387 (Fla. 4th DCA 1974). Unless it is shown when a fingerprint was placed on a particular item or a particular location, that fingerprint is an insufficient circumstance on which to base guilt. In the case sub judice the fingerprint evidence was not the sole basis on which the prosecution rested. The purpose of introducing the fingerprint and the bullet into evidence was to corroborate the testimony of state's witnesses. Under the circumstances of this case, the trial judge did not commit reversible error in admitting the fingerprint evidence as well as the bullet. See Bryant v. State, 235 So.2d 721 (Fla. 1970).
Everything seized and sent to the FBI was returned in substantially the same basic condition, with the exception of necessary alterations for the purpose of testing and identification. This was a sufficient predicate showing chain of custody. See Dixon v. State, 216 So.2d 85 (Fla. 2d DCA 1968) (defendant's argument that there was an insufficient showing of a chain of custody of his clothes was without merit.) The defendant has failed to show the trial court abused its discretion in admitting these challenged items into evidence.
Dr. Machler, defendant's psychiatrist, had conducted a sodium butathol test and a video tape presentation of Dr. Machler's interview with the defendant had been presented to the grand jury. A proffer of this testimony was made at trial and defendant says the trial judge committed error in not allowing it into evidence. The trial court also refused to allow the testimony of Dr. Allen Zimmer, another psychiatrist. The results of a sodium butathol test are not admissible in a criminal prosecution. There would be no way to cross-examine defendant when he was making revelations of fact, which, according to him, he could not otherwise remember. Such evidence would be hearsay. See Cirack v. State, 201 So.2d 706 (Fla. 1967). The rationale supporting the well-established rule that results of a polygraph examination are inadmissible, is equally applicable to the results of a sodium butathol test. See Sullivan v. State, 303 So.2d 632 (Fla. 1974); State v. Riggins, 348 So.2d 1209 (Fla. 4th DCA 1977); Crawford v. State, 321 So.2d 559 (Fla. 4th DCA 1975), approved in State v. Crawford, 339 So.2d 214 (Fla. 1976).
Also the trial judge properly excluded the testimony of the psychiatrist, Dr. Zimmer. Defendant's sanity was never an issue at trial. During the guilt phase of the trial, testimony regarding the mental state of a defendant in a criminal case is inadmissible in the absence of a plea of not guilty by reason of insanity. Tremain v. State, 336 So.2d 705 (Fla. 4th DCA 1976).
The defendant next contends that the trial court committed reversible error when he admitted Frank Smith's alleged conversation with the defendant because the conversation was over a telephone and the evidence was therefore hearsay. Edward Williams testified that the defendant inquired of him about obtaining a "hot gun" sometime in June prior to the homicides. Williams went to Frank Smith's home and in Smith's presence called the defendant. Williams told defendant that Smith did not have any guns at that time and defendant told Williams to put Smith on the telephone. Williams handed Smith the telephone, Smith spoke to someone who identified himself as Tommy Zeigler. As a result of that conversation Smith purchased two RG revolvers at the Diamond Jim Pawn Shop in Orlando from Mary Pringle. After he purchased the guns he called a number that was given to him by the person with whom he had spoken in Edward Williams' presence. The phone was answered: "This is Zeigler Furniture Store." Smith asked for Tommy Zeigler and the voice responded, *374 "This is he speaking." Smith recognized that voice as belonging to the person with whom he had spoken during the first conversation. Smith told the person what kind of guns he had and how much they would cost and the person agreed. Later defendant called Williams and asked him to go over to Smith's house and pick up a package. Defendant gave Williams a sealed envelope which he gave to Smith in return for a paper sack in which he saw the butts of two guns. Smith testified that he received the money from Williams and that he gave Williams a paper bag containing the two RG revolvers.
In cases in which the fact that a telephone call was made or received becomes relevant by reason of its bearing upon a material issue, the fact may become admissible in evidence as an independently relevant one irrespective of the substance or narration involved, or the truth or falsity thereof. Annot., 13 ALR 2d 1411, 1412 (1950). See Chacon v. State, 102 So.2d 578 (Fla. 1957). Utterances are exempt from the hearsay rule. For example, utterances which accompany a material, equivocal act, and serve to complete the act and give it definite legal significance are exempt from the hearsay rule. See 6 Wigmore on Evidence, § 1766 at 177 (3d ed. 1976). Smith's testimony concerning the telephone conversation represented a verbal act which formed the basis for his subsequent action in securing the two RG revolvers and delivering them to Williams.
The other theory which supports the trial court's ruling is that telephone conversations are competent evidence provided that the identity of the person with whom the conversation was had is established by direct evidence, facts or circumstances. 7 Wigmore on Evidence, § 2155 (3d 1978). The admissibility of these conversations is governed by the same rules of evidence concerning face-to-face conversations except the party against whom the conversations are sought to be used must be identified. Although Smith did not positively testify that the person with whom he spoke was defendant, other facts and circumstances provided the basis for the conclusion that defendant was the person with whom Smith spoke. Circumstances both preceding and following the conversation sufficiently identified the caller as defendant. The completeness of the identification went to the weight of the evidence rather than to its admissibility. The trial court correctly ruled that Smith's testimony was admissible.
The defendant complains of the manner in which Juror Young was excused and the alternate juror seated. He also questions the propriety of numerous consultations prior to the rendition of the verdict among the court, attorneys, bailiffs, clerk, nurse, and a juror. The trial judge's action demonstrates the exercise of sound discretion. The defendant has failed to demonstrate reversible error in the circumstances surrounding the deliberations of the jury.
Defendant filed a request to interrogate the jurors. He claimed that he had no intention of delving into how the jurors conducted their deliberations; however, his effort to determine the existence of "juror misconduct" would necessarily have accomplished the same thing. An interview of jurors was held by the trial court, but defendant complains that he did not get the chance to conduct the interviews. Inquiry by the trial court evaporated any grounds, either real or imagined, for defendant's motion to interview the jurors. The trial court did not commit reversible error in refusing to allow defendant's counsel to interview the jurors.
Defendant testified that he was attacked by unknown assailants. He related how he fought with his attackers, how he was in and out of consciousness and how he suffered a gunshot wound and heard the unknown voice directing that Charles Mays or someone be killed. The jury rejected this defense and the evidence, as previously discussed, was ample to sustain the verdict of the jury.
By its verdict the jury found proof beyond a reasonable doubt that defendant had committed four murders within the course *375 of two hours. He killed Eunice quickly and for her, unexpectedly. She was shot from behind. With Eunice dead, defendant then shot his in-laws. Perry struggled with the defendant. Defendant subdued Perry, rendered him harmless, and shot him once while he lay on the floor. Defendant then went in search of Virginia, found her and shot her in the head. The evidence shows that these people were killed prior to 7:30 P.M.
By 9:00 P.M. he had murdered Mays in furtherance of a crafty design to focus attention on others as the murderers. Defendant could not persuade Thomas to enter the store so Thomas survived. He got Williams partially inside the back hallway, turned on him and tried to shoot him in the chest. The gun failed to fire, so Williams survived.
By this time, defendant was very desperate. He had four bodies in the store and little, if anything, to support the appearance of a surprise robbery and massive shootout. He would not appear to be involved if he happened to be one of the victims. Accordingly, he shot himself and called the police for help.
The jury returned a verdict of first degree murder for the homicides of Eunice and Mays and a verdict of second degree murder for the homicides of Virginia and Perry. After the sentencing procedure, the jury recommended life imprisonment. The trial judge overruled the recommendation of the jury and imposed the sentence of death for the murders of the wife and Charles Mays. The following findings of fact were filed by the trial judge:
Florida Statutes 921.141(3) requires specific written findings of fact when a sentence of death is imposed. Additionally, it is recognized that the Florida Supreme Court has set forth, in addition to the enumerated statutory factors relative to "aggravating" and "mitigating" circumstances, the admonishment that "... in order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 ([Fla.]1975). In following the statute (Fla. Stat. 921.141), the trial judge is directed to weigh the statutory aggravating and mitigating circumstances when determining the appropriate sentence to be imposed in light of all the facts adduced. In short, the trial judge must justify imposition of a sentence of death, which must be in writing, applying the facts of the case to legislatively mandated criteria.
"When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided in Fla. Stat. § 921.141(7), F.S.A. All evidence of mitigating circumstances may be considered by the judge or jury." State v. Dixon, 283 So.2d 1, 9 (Fla. 1973).
"It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of x number of aggravating circumstances and x number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present." State v. Dixon, supra, at pg. 10.
First, a consideration of the "aggravating" factors as found in the evidence and established by the verdicts returned by the jury.
(a) Defendant was not under sentence of imprisonment at the time he committed the four murders in these cases.
(b) Defendant, at the time he committed the four murders, had not been previously convicted of another capital offense or of a felony involving violence or threat of violence.
(c) Defendant, at the time he committed the murders, did knowingly create a risk of death to many persons.
(d) Although open to a different interpretation, the Court does not find that *376 the murders were committed while Defendant was engaged in any robbery, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb.
(e) The murder of Charles Mays was committed by the Defendant to cover up the fact he had earlier murdered his wife and in-laws and thus, was committed for the purpose of avoiding or preventing a lawful arrest.
(f) The murder of Eunice Zeigler was committed for pecuniary gain  i.e., collect $500,000.00 in insurance benefits. The murders of Charles Mays, Virginia Edwards and Perry Edwards were committed in furtherance of his plan to murder his wife for the money and to have it appear she was killed by Charles Mays and others in perpetration of a robbery or a breaking and entering.
(g) The murder of Eunice Zeigler was not for the purpose of disrupting or hindering the lawful exercise of any governmental function or enforcement of laws; it is arguable that the killing of Charles Mays (also Mr. & Mrs. Edwards) was for purpose of disrupting or hindering enforcement of the law, i.e., to escape prosecution and detection for the murder of Eunice Zeigler and her parents by attempting to cast blame for these killings on Charles Mays.
(h) The murders of Eunice Zeigler and Charles Mays were especially heinous, atrocious, and evil. The evidence establishes that the killings, including those of Mr. & Mrs. Edwards, were in fact extremely wicked, shockingly evil, outrageously wicked and vile and designed to inflict a high degree of pain with utter indifference to their suffering, and committed without any pity or apparent remorse.
The statements made by the Court at time of sentencing, and later reduced to writing and filed in this proceeding, are also incorporated into this written finding, by reference, and made a part hereof.
Having found sufficient "aggravating" circumstances exist which justify and require imposition of the death sentence, it becomes necessary to determine whether or not sufficient mitigating circumstances exist which outweigh the aggravating circumstances.
The evidence establishes:
(a) The Defendant has no significant history of prior criminal activity.
(b) The murders were not committed by Defendant while under the influence of extreme mental or emotional disturbance.
(c) None of the victims were participants in the Defendant's conduct nor did any of them consent to his acts or actions.
(d) Defendant was the sole participant and perpetrator of the murders in question.
(e) Defendant did not act under extreme duress nor was he under the substantial domination of another person at the time he committed the murders.
(f) Defendant suffered no impairment of mental capacity.
(g) Defendant was thirty years old when the crimes were committed.
The aggravating circumstances have been proved to the exclusion of any reasonable doubt. Only one mitigating factor is present  the Defendant has no significant history of prior criminal activity  which is not sufficient to override the aggravating circumstances present.
No useful purpose would be served by a recitation of the facts and evidence in these cases  they are a matter of record and nothing herein stated can or could change them. It is the facts which require this Court to not accept the jury recommendations of life imprisonment and to impose the death sentence. In reaching this conclusion, this Court has reviewed and attempted to follow the law and procedure heretofore enunciated by the Florida Supreme Court in its decisions relative to imposition of a sentence of death and as approved by the United States Supreme Court in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
*377 The question of whether the murder of Eunice Zeigler was especially heinous, atrocious, and evil becomes immaterial when all of the aggravating and mitigating factors are considered. The trial judge obviously concluded that the facts surrounding this mass murder and suggesting a sentence of death were so clear and convincing that virtually no reasonable person could differ. Although the physical act of killing Eunice by shooting her from behind did not fall within this Court's definition of the statutory factor, "especially heinous, atrocious, and cruel," the fact that she was murdered for pecuniary gain and defendant knowingly created a risk of death to others by virtue of the overall scheme of a planned mass homicide could certainly be given consideration by the trial judge. This court has affirmed the trial court's override of a jury recommendation of life based on facts showing equal or even less aggravating factors. See Gardner v. State, 313 So.2d 675 (Fla. 1975) vacated Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), and Sawyer v. State, 313 So.2d 680 (Fla. 1975). Subsequent to Tedder v. State, 322 So.2d 908 (Fla. 1975), we affirmed a trial court's override of a jury recommendation of life in Douglas v. State, 328 So.2d 18 (Fla. 1976); Dobbert v. State, 328 So.2d 433 (Fla. 1976); Barclay v. State, 343 So.2d 1266 (Fla. 1977); and Hoy v. State, 353 So.2d 826 (Fla. 1978).
The facts supporting the sentence of death are clear, convincing, and are established beyond a reasonable doubt.
We have carefully examined the thirty-two volumes of the record in this case and carefully considered the brief of the defendant. In some instances defendant has been able to show certain inconsistencies in the evidence. However, when one considers the magnitude of this case, all facts could not be expected to match perfectly. The defendant has not shown anything in his brief which purports to be a reasonable hypothesis of innocence. An examination of the evidence presented to the jury does not and cannot lend itself to such a construction. Defendant has had a fair trial and the other questions presented by him in his brief are without merit.
It is therefore our opinion that the judgments and sentences should be affirmed.
It is so ordered.
BOYD, OVERTON and ALDERMAN, JJ., concur.
SUNDBERG, C.J., and ENGLAND, J., concur in conviction but dissent as to sentence.