PER CURIAM.
Wadada Delhall appeals from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Delhall’s conviction for first-degree murder, but we vacate Delhall’s death sentence and remand for a new penalty phase proceeding.
FACTUAL AND PROCEDURAL HISTORY
Overview
Wadada Delhall, age twenty-four at the time of the murder, was indicted on January 8, 2002, for the November 29, 2001, first-degree premeditated murder of Hubert McCrae in his auto repair shop in Opa-locka, Florida. He was also charged with unlawful use of a firearm in violation of section 782.04, Florida Statutes (2001), unlawful discharge of the firearm resulting in death or serious bodily harm upon McCrae in violation of section 790.07(2), Florida Statutes (2001), and possession of a firearm by a convicted felon.[1] At the jury trial held in June 2008, the State presented evidence that Delhall murdered McCrae because he was, at that time, the only known eyewitness to the murder of another individual named Gilbert Bennett with which Delhall’s brother Negus Delhall was charged. The jury found Wadada Delhall guilty of all the charges and the case proceeded to the penalty phase trial.
At the conclusion of the penalty phase, the jury recommended a death sentence by a vote of eight to four, and the trial court ultimately entered an order sentencing Delhall to death. This appeal ensued. Delhall raises ten issues on appeal concerning admission of evidence in the guilt phase and improper prosecutorial argument in the penalty phase, as well as a claim of error in a jury instruction in the *143 penalty phase.[2] We turn first to the facts of the case based on the evidence presented in the guilt phase of the trial.
The Guilt Phase
Fred Williams was working at the J & B Body Shop in the warehouse area of Opa-locka Boulevard in Opa-locka on November 29, 2001. Around 6:50 p.m., he heard a series of gunshots coming from the direction of Ray’s Auto Service shop (sometimes called Ray’s Auto Shop or Ray’s Auto Body Shop) located at 2143 Opa-locka Boulevard. Williams looked in that direction and saw a slim, brown-skinned man, about 5' 11" tall, coming out of Ray’s Auto Service with his hand held down by his side. Williams could not make out the man’s face. The man came out to a car, reached for the door handle, then turned around and shot one more time toward the shop. The man then got into the passenger side of the car and, as it drove away, shot one more time out the window. Williams said the car was a small, light-colored car with tinted windows. Rolando Rodriguez was also at work at the J & B Body Shop on November 29, 2001, and heard a series of shots. He did not see who was shooting, but he did see a person at the passenger side door of the car just before it left. As the car turned left to leave, Rodriguez heard another shot.
Miami-Dade Police Officer Michael Huf-nagel arrived at the scene of the shooting and found Hubert McCrae lying on the ground in front of a car repair bay. McCrae was still alive but in obvious pain from gunshot wounds, including an apparent stomach wound. McCrae told Officer Hufnagel that he was having difficulty breathing. Hufnagel rolled McCrae onto his side to ease his breathing. Officer Hufnagel asked McCrae if he had any idea who shot him and, over defense objection to hearsay, Officer Hufnagel testified that McCrae said “it was the brother of the guy who shot the man who owned the business before.” Officer Hufnagel said McCrae gave him a description of the shooter’s car as “a small gray Mazda, possibly a 328” with tinted windows, and Hufnagel relayed this information to the detectives when they arrived. During the time he was talking, McCrae continued to have labored breathing and a look of pain on his face. Fire rescue then arrived and began working on McCrae, during which time he died.
The Gilbert Bennett Murder
Over Delhall’s objection, the State presented a substantial amount of testimony and evidence concerning the earlier murder of Gilbert Bennett at that same repair shop in 1998, which was referred to by McCrae. The evidence included testimony of four witnesses, a detailed description of the Bennett murder crime scene and investigation, as well as photos showing Bennett’s lifeless body lying in a pool of blood. The asserted purpose for presentation of the evidence concerning the Bennett murder was to prove Wadada Delhall’s motive for murdering McCrae, who was at the time the sole known witness to the Ben *144 nett murder. A fingerprint lifted from the outside of the office door at the scene of Bennett’s murder was attributed to Negus Delhall, Wadada Delhall’s younger brother. An arrest warrant was subsequently issued for Negus Delhall in the murder of Bennett, but it was not until 2001 that Negus was finally arrested out of state and transported back to Miami from Virginia Beach, Virginia.
Hubert McCrae had provided police with a description of Bennett’s shooter and had given a sworn statement about what he witnessed. After Negus’s arrest, an Arthur hearing to determine if bond would be set for Negus was held on September 6, 2001.[3] McCrae did not testify at the bond hearing, but his sworn affidavit describing how he witnessed the Bennett murder and identified a photograph of the shooter was introduced at that hearing.[4] No other eyewitness had been located as of that date. The evidence also established that Wadada Delhall had visited Negus in jail and was very disturbed by the fact that he was charged with Bennett’s murder and might be facing the death penalty.
After Hubert McCrae was killed, the police located another eyewitness to the Bennett murder — Clarence Gooden. Goo-den used to operate a food truck in the warehouse area and testified at Wadada’s trial that he actually witnessed the murder of Gilbert Bennett at that auto repair shop in 1998, but did not come forward as a witness. Gooden described how he was parked near the shop in 1998 when he heard shots from inside the office area of the shop and then observed a man leaving the shop carrying a gun. Gooden described how he entered the shop and found Bennett lying on the floor in a pool of blood. Gooden testified that it was Negus Delhall who shot Bennett, although he did not know Negus’s name at the time, and that McCrae was also present. Gooden said he left because he did not want to get involved. After Negus’s arrest, Gooden said Wadada Delhall and a man named Erwin Bruce came to Gooden’s food truck to talk to him about Bennett’s murder, and Gooden assured them he was not going to tell the police anything about the murder. It was some days later that Gooden learned McCrae had been killed at the same auto shop. Gooden subsequently became a witness at Negus’s trial.
Investigation of McCrae’s Murder
The State’s theory of the case was that Wadada Delhall learned that Hubert McCrae was the sole witness against Ne-gus after the Arthur hearing and began searching for him. The State contended that after Delhall learned that Gooden was not the eyewitness who was prepared to testify against Negus, Delhall concluded that the man who worked at Ray’s Auto Service must be the sole eyewitness identified as Hubert McCrae. After learning that McCrae had identified his assailant as the brother of the shooter in the Bennett murder, Miami-Dade Police Detective John Butchko began searching for Negus’s brothers, Wadada and Atiba, to question them. Butchko and his team, Sergeant Yolanda Rayborn and Detectives Julio Es-topinan and Gus Bayas, finally located an apartment connected to Wadada Delhall in Pembroke Pines.
On December 5, 2001, Butchko and his team went to the apartment where they *145 observed a car matching the description of the car seen leaving the McCrae shooting. The apartment door was answered by Del-hall’s cousin, Tiese Caldwell, who explained that Wadada Delhall lived there but was not home. Caldwell told the officers that aside from the several small children playing in the living room, no one else was home. When asked if they could search, she refused but did allow them in to talk with her. At one point Detective Bayas became alarmed and asked her again if anyone else was there. She said there was not, but Bayas insisted that he “just heard a noise behind me.” When he heard the sound again, Bayas immediately drew his gun and went to the adjacent bedroom, and within seconds was yelling at someone to get down on the floor. Ba-yas said he found a man hiding in a closet. When the man emerged from the closet, he told Bayas he was hiding because he was on probation and did not want to get into trouble. After being checked for weapons — he had none — the man was taken downstairs in handcuffs. Once the officers learned that the man was Wadada Delhall, the handcuffs were removed and Delhall was not placed under arrest.
Delhall agreed to go to the police station to answer some questions and was not handcuffed on the ride to the station or when he arrived there. Once at the station, a Miranda[5] rights form was read to him, after which he initialed each right and signed the form. When asked about his activities on November 29, 2001, Delhall initially reported that he was with his girlfriend, Marcia Berry, after picking her up from work at 6:30 p.m. Delhall told Butch-ko that after going to a shopping mall and then to Berry’s father’s house, he and Berry took her father’s car, a black Chevrolet, back to their apartment at 10640 Washington Street, Pembroke Pines, where they stayed through the night. Delhall also told Butchko that his girlfriend, Marcia Berry, who worked at American Express in Broward County, drove the Mazda that was parked at the apartment.
When questioned further about the murder of McCrae, Delhall denied any involvement or knowledge of the facts. Delhall had agreed to go to the station around noon and, once there, Butchko’s questioning lasted until about 3:30 p.m., at which time they took a break. After Butchko returned to the interview room at 4:30 p.m., and Delhall continued to deny involvement in McCrae’s murder, Butchko asked for assistance from William Clifford, who was described as a civilian employee who sometimes assists in interrogations.[6] Delhall signed a consent form to allow questioning by Clifford, and Butchko left to contact Detective Bayas, who was in Broward County to meet with Marcia Berry.
William Clifford testified that he asked Delhall about November 29, 2001, and Del-hall again denied knowing McCrae or anything about his murder. When Clifford told him they could find out if he had had any dealings with McCrae, Delhall then admitted he had not been entirely truthful and that he did know who McCrae was, having gotten the name from Negus’s first lawyer, Paul Gerson. Delhall told Clifford that he learned from Gerson that McCrae was the only witness against Negus in the Bennett murder. Delhall continued to insist that he was with Marcia Berry at the time of the McCrae murder. Pursuant to *146 department policy at the time, no audio or video of this interview was recorded.
Marcia Berry did not confirm Delhall’s alibi and, when confronted with this fact, Delhall confessed to Clifford that he killed McCrae to keep him from testifying against Negus. When he visited Negus in jail a few days before the McCrae shooting, Negus told Delhall that the State wanted the death penalty, and when Ne-gus broke down and cried, Delhall was “shaken up about that.” The handwritten confession was admitted over Delhall’s pretrial and trial objections, and stated as follows:
I’m sorry, for being in this prodickument (sic). But, I was left without solution when I heard that my brother was facing the death penalty. I try to get a lawyer w/ friends of mine, but the money was not even, so I even got church members to raise charity from church, but by this time, I was already out of time. So the love of my brother was vanishing away forever, so in my heart I feel like I wouldn’t have a brother because of a lie, so in desperation I went by my self to the shop and shot him. I’m sorry. But I got [to] take responsibility.
After Clifford obtained the written confession, Butchko returned and questioned Delhall further about the details of the murder. According to Butchko, at that point Delhall was not free to leave the interview, but he agreed to continue speaking with Butchko.
Delhall later refused to go through the details again with a court reporter present, but in the oral interview with Butchko, Delhall described further details of the murder and, in this version of events, claimed to have acted alone. Delhall told Butchko that he was driving Berry’s older model Mazda with tinted windows, and had with him a 9mm semiautomatic handgun and a .38 caliber silver-colored revolver. Delhall also reported dropping Berry off at home shortly after 6 p.m. and driving to Opa-locka in the Mazda. According to Butchko, Delhall said that he first planned to scare McCrae by showing him the gun, but that when he drove by McCrae’s shop he “thought he would leave it in God’s hands.... If God didn’t want me to shoot the victim, then don’t let the victim be there.” Delhall saw McCrae working on a sport utility vehicle but kept driving. He then came back into the warehouse area and drove past the victim again. Butchko said Delhall reported that the passenger side of the car was toward the shop.
This description of the side of the car facing McCrae did not comport with other witnesses’ testimony that there were two people in the ear and that the shooter got into the passenger side of the car. Instead, Delhall told Butchko he was alone, got out of the car with the semiautomatic in one hand and the revolver in the other, and that when he was about ten feet from McCrae, he started shooting with both guns. Butchko did not formally learn that two guns were used in the shooting until speaking with the firearms examiner on January 16, 2002. Delhall also told Butch-ko that just before he got back into the car, he fired another shot to scare any possible witnesses. After leaving the scene, Delhall said he drove to Hialeah where he sold both guns to someone on the street.
At 11:15 p.m. on December 5, 2001, detectives Butchko and Estopinan left the interview room after telling Delhall they thought he was not giving the whole story and that someone else was involved. About a half hour later, the detectives returned and Delhall told them that his brother, Atiba, was with him in the car earlier on November 29, but that he had dropped him off before the shooting. Delhall con *147 tinued to maintain that he did the shooting alone, although the police knew from the witness statements that there was a second person in the car. At about 1:30 a.m. on December 6, 2001, Delhall said he would tell the officers the whole truth. He then admitted that Atiba was with him and was the one driving Marcia Berry’s car. Delhall said Atiba did not fire any shots at McCrae, which was in accord with witness testimony that Delhall was the passenger of the car and was the one who fired the shots. Around 2 a.m., Butchko told Del-hall they wanted him to provide a formal statement, after going through the unrecorded interview orally, but there was no stenographer present. The stenographer did not arrive until about 3:30 a.m., and by then, Delhall’s mood had changed. He refused to give a recorded statement, saying:
All those things I told you. The whole thing is a lie. My brother wasn’t with me. I can’t do that to my mother .... I can’t face my mother by saying my brother is involved in this. I’m not giving a statement.
Butchko agreed there was no eyewitness identification of the person who did the shooting and that no firearms were ever recovered.
Delhall’s girlfriend in 2001, Marcia Berry, testified that she left work around 3 p.m. on November 29, 2001, and that when Delhall picked her up, Atiba was with him. Around 5:15 p.m., Wadada and Atiba drove her home to Pembroke Pines and then left. She testified that she next saw Wadada later that evening when he came back around 10 p.m., or a little later, and they went to Checkers restaurant. With Berry’s consent, a search was done of her 1992 Mazda Protege automobile. Retired Miami-Dade Police Detective Tommy Charles testified that on December 6, 2001, he searched the Mazda and found, among other things, a probation payment receipt issued to Wadada Delhall, a job application by Delhall, a book bag with papers bearing Delhall’s name, Marcia Berry’s passport, and a live round of 9mm ammunition manufactured by Winchester found in one of the book bags in the car. Marcia Berry testified that in 2001, she did not keep any ammunition in her car and did not know why a 9mm live round of ammunition was found in her car. Detective Charles also processed the vehicle for fingerprints, and found a latent print identified as belonging to Wadada Delhall.
George Hertel, a criminalist supervisor at the Miami-Dade Police Department crime laboratory, testified concerning a report prepared by a former crime laboratory criminalist, Jess Galan, on the firearms used in McCrae’s murder. Hertel testified that two different firearms were used in the McCrae murder. In Hertel’s opinion, the first group of projectiles, comprising ammunition produced by various manufacturers, was fired from a 9mm weapon, probably a Smith and Wesson semiautomatic. The second group was, in his opinion, fired from a revolver, possibly a “.38 Special or .350 manufactured by Luger.”
Finally, Dr. Emma Lew, Chief Medical Examiner for Miami-Dade County, testified about the autopsy report on Hubert McCrae. Dr. Lew testified that after reviewing the report and autopsy files, it was her opinion that Hubert McCrae died of multiple gunshot wounds and that the manner of death was homicide. Dr. Lew reported that McCrae suffered fifteen gunshot wounds to various parts of his body, mostly to his left side. She testified that the fatal gunshot wound was likely the one to the right side of McCrae’s abdomen, which resulted in a projectile traveling through the mesentery of the small bowel and upward through his liver and into his diaphragm. There was a quart of blood in *148 the abdominal cavity, which would have taken minutes to occur.
After the State rested, Wadada Delhall testified in his own defense, explaining how, after his mother was arrested and deported back to Jamaica several years earlier, he began caring for his brothers, the youngest of whom was an infant. His father was absent and, at age eighteen, Delhall was the oldest son and became responsible for brothers Negus, Bobo, Ati-ba, Jamal, and Dwight. He explained that when his brother Negus was arrested for Bennett’s murder, Delhall hired Paul Ger-son to represent Negus at the Arthur hearing. Delhall said he did not attend the hearing, and he denied murdering McCrae.
Delhall testified that on November 29, 2001, he picked up Berry from work, but denied that Atiba was with him. He testified that after he left Marcia at her house, he dropped off another brother, Jamal, at home and then went to a music studio. He said he never left the studio until he picked up Berry and took her to a fast food restaurant in Pembroke Pines late that evening. He added that he gave a statement confessing to murdering McCrae because Clifford told him the officers were considering arresting his fourteen-year-old brother, Jamal. He said he confessed because he also feared being beaten up by the police, and related an incident in Broward County in which he said officers beat him after he was arrested for fleeing officers in a car chase. Del-hall testified that Clifford told him he would try to get a deal for three to five years to add to his probation, and that if he wanted to help himself he should write up a statement and “just tell them you are sorry for being in this predicament and tell them stuff that you will do to help your brother, your brother that’s locked up.” When shown a copy of the statement he wrote, Delhall said it was “[t]he statement Mr. Clifford coerced me to write.” Delhall said when he first gave the statement to Clifford, it did not include confessing to the murder, and that when Clifford read the statement, he said, “Man, look here. You are not' putting yourself involved in any crime.... I came out here to help you. If you don’t put yourself involved with the crime, I’m going to leave you with these guys and they can do what they want with you.” Delhall said Clifford told him to write that he shot McCrae. Delhall denied ever giving any details of the crime to Butchko after speaking with Clifford, and that all the things Butchko said about Delhall selling the guns on the street and putting the decision to shoot McCrae in God’s hands were made up. He also denied telling Butchko he was with Atiba.
In rebuttal, the State presented testimony from Broward County Sheriffs Deputy Christopher Schaub, who testified about Wadada’s 1999 arrest for fleeing and eluding and the subsequent altercation with officers, which Delhall referred to in his testimony. Schaub testified that when Delhall was on the way to be fingerprinted, Delhall began throwing punches and ripped his shirt. They were struggling on the floor when, Deputy Schaub testified, “I felt him grab a hold of my gun. He was tugging on my gun.” After closing argument in the guilt phase, the jury returned a verdict finding Wadada Delhall guilty as charged on all counts. The case proceeded to an August 13, 2008, penalty phase proceeding.
Penalty Phase and Sentencing Order
The State presented evidence of Del-hall’s prior violent felony conviction arising from the December 1999 incident involving Deputy Schaub in the Broward County Sheriffs substation after Delhall was arrested for fleeing police in a car chase. The State presented the judgment and *149 sentence for aggravated fleeing and eluding, resisting with violence, driving while license suspended, leaving the scene of an accident, and several misdemeanors. This prior violent felony conviction was relied on as an aggravating factor in the sentencing order. The State also presented victim impact evidence by Irma McCrae, Hubert McCrae’s widow; Roslyn McCrae, his daughter; and Andrew Benjamin, a cousin.
The defense presented the testimony of ten family members and one family friend in mitigation. These witnesses testified about how, after his mother was deported and with his father absent, Delhall took over caring for his younger brothers, including an infant. Delhall was described as a loving son, brother, and cousin, who cared deeply for his family and felt responsible for taking care of his younger siblings. He was like a brother and a father to them, and urged them to stay in school. The jury, by a vote of eight to four, returned an advisory verdict recommending that Delhall be sentenced to death. As discussed in detail below, during closing argument, defense counsel lodged numerous objections to comments of the prosecutor. These comments, along with several other errors discussed below, are the basis for this Court’s reversal of the penalty phase.
Prior to sentencing Delhall, the trial court held a Spencer[7] hearing at which the defense presented mitigation testimony of Dr. Brad Fisher, a clinical psychologist. Dr. Fisher testified that Delhall would likely adjust properly to the rules of prison if incarcerated for life without parole. As to mitigating circumstances, the court found Delhall’s family background and positive family relationships to be factors in mitigation, but gave them little weight. The trial court also found that friends and family testified of the devastating impact the defendant’s execution would have on them, but gave this mitigation little weight. Little weight was also given to the testimony of Dr. Fisher that Delhall would adjust well to life in prison. The trial court subsequently issued an order sentencing Del-hall to death based on four aggravating circumstances: (1) the murder was cold, calculated, and premeditated (CCP) (great weight); (2) Delhall had a prior violent felony conviction for resisting arrest with violence in Broward County (great weight); (3) the murder was committed while Delhall was on probation (great weight); and (4) the murder was committed to hinder or disrupt government function or enforcement of law (great weight).
We turn first to a discussion of the sufficiency of the evidence presented in the guilt phase.
Sufficiency of the Evidence
Delhall does not challenge the sufficiency of the evidence to support the conviction for first-degree murder. However, this Court has a mandatory obligation to review the sufficiency of the evidence of first-degree murder in every case in which a death sentence has been imposed, even where the issue is not raised on appeal. See Fla. R.App. P. 9.142(a)(5); see also Miller v. State, 42 So.3d 204, 227 (Fla.2010) (“[Tjhis Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed.”).
“In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier *150 of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). That test is met in the evidence presented in this case. The State presented evidence that on November 29, 2001, Hubert McCrae was found still alive but with multiple gunshot wounds, lying on the ground in his auto repair shop in Opa-locka. The parties stipulated that the victim was Hubert McCrae. McCrae had previously given police a statement about witnessing the murder of a man named Gilbert Bennett at the same auto shop in 1998. The evidence showed that Delhall’s brother Negus was subsequently identified as Bennett’s murderer and had been arrested and charged. As McCrae lay injured, he told a responding officer that the person who shot him was “the brother of the guy that shot the man that owned the business before.” The State presented the written, signed confession of Wadada Delhall admitting to the murder of McCrae, in which Delhall said he shot McCrae to protect his brother Negus in the prosecution of the Bennett murder case. The State also presented the waiver of Miranda rights signed by Delhall before he confessed. Descriptions of the car in which the murderer left the scene matched the car owned by Delhall’s girlfriend and in which Delhall rode with his brother Atiba on the day of the murder. Some of Delhall’s personal possessions were found in the car, along with an unfired round of ammunition of the same caliber that was used in shooting McCrae. Viewing the competent, substantial evidence submitted at trial in the light most favorable to the State, we find that the evidence was sufficient to prove Delhall guilty of first-degree murder. We turn next to Delhall’s claim that his confession should have been suppressed.
Delhall’s Confession
Prior to trial, Delhall filed a motion to suppress his statements to police on the grounds that they were obtained in violation of his Fourth Amendment rights subsequent to a warrantless search of his apartment and what he contends was an illegal arrest without probable cause during that search. A suppression hearing was held at which Detectives Ray Hoadley, Butchko, and Bayas, Sergeant Rayborn, and William Clifford testified. The trial court denied the motion.
“A trial court’s ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Connor v. State, 803 So.2d 598, 605 (Fla.2001) (quoting Murray v. State, 692 So.2d 157, 159 (Fla.1997)). As we explained in Connor, a trial court’s ruling on a motion to suppress is a mixed question of law and fact that ultimately determines constitutional rights and should be reviewed using a two-step approach — deferring to the trial court’s findings of fact as long as they are supported by competent, substantial evidence, but reviewing de novo a trial court’s application of law to the historical facts. Connor, 803 So.2d at 605; see, e.g., Ornelas v. U.S., 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We conclude that the trial court did not err in denying Delhall’s motion to suppress because the search conducted in his apartment was not an unreasonable search. Moreover, Delhall went with the police to the police station and spoke with them voluntarily, and was not arrested until after he confessed. Delhall was advised of his right to remain silent and to have an attorney present, and waived those rights in a written waiver *151 form prior to giving his statements. We first examine the warrantless search of his bedroom in which he was discovered hiding in a closet.
Delhall first contends that his confession should have been suppressed because it was the result of a warrantless search of his bedroom. The State counters that the officers were present in the home with consent, and officer safety required the search that disclosed Delhall hiding in a closet. We agree. There is no dispute that the police were inside Del-hall’s apartment with the consent of one of the occupants, Tiese Caldwell. There is also no dispute that she told the officers several times that only she and her several young children who were with her in the living room were the only ones home. Further, the facts are not in dispute that the police were at the apartment because they had information that one of Negus’s brothers killed McCrae. When the police arrived, they noted the presence of a Mazda automobile, which they knew matched the description of the car driven by the shooter. Delhall further contends that because Caldwell denied permission to search the apartment, the warrantless search that disclosed Delhall hiding in the closet violated the Fourth Amendment and was not an authorized protective sweep incident to a lawful arrest in the apartment. However, exceptions exist which justify a warrantless search within a home that is not required to accompany a lawful in-home arrest.
“It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is ‘per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.’ ” Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (quoting Katz v. U.S., 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); see also Twilegar v. State, 42 So.3d 177, 192 (Fla.2010) (noting that although a warrantless search of a home is per se unreasonable, “several exceptions to this rule have developed”) (citing Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). We have recognized “[t]he right of police to enter and investigate an emergency, without an accompanying intent either to seize or arrest ... [is] inherent in the very nature of their duties as peace officers and derives from the common law.” Zeigler v. State, 402 So.2d 365, 371 (Fla.1981). “[Pjolice may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests.” Twilegar, 42 So.3d at 192 (quoting Seibert v. State, 923 So.2d 460, 468 (Fla.2006) (emphasis removed)). Such a search must be “strictly circumscribed by the exigencies which justify its initiation.” Seibert, 923 So.2d at 468 (quoting Mincey, 437 U.S. at 393, 98 S.Ct. 2408). The search must cease once the officer determines that the emergency does not exist or has been met. Id. (citing Rolling, 695 So.2d at 293). “It is immaterial whether an actual emergency existed in the residence; only the reasonableness of the officer’s belief at the time of entry is considered on review.” Seibert, 923 So.2d at 468. “There is no catalog of all the exigencies that may allow a warrantless search of a residence because ‘[t]he reasonableness of an entry by the police upon private property is measured primarily by the totality of existing circumstances.’ ” Davis v. State, 834 So.2d 322, 327 (Fla. 5th DCA 2003) (quoting Zeigler, 402 So.2d at 371). These same principles apply when police are in the home lawfully, such as in this *152 case with consent of one of the occupants, and circumstances arise that provide an objectively reasonable basis for officers to believe that there is an immediate need for protection of themselves or other occupants.
In the instant case, the officers were in Delhall’s apartment lawfully with the consent of an occupant, Tiese Caldwell. Even though she explicitly assured officers more than once that no one else was in the apartment, Detective Bayas heard unidentifiable sounds coming from the bedroom, which was adjacent to the living room. The officers had reason to believe that one of Negus’s brothers shot MeCrae and, based on the leasing agent’s information, had reason to believe that Delhall and possibly another male lived in the apartment. They knew that a car matching the shooter’s car was parked outside the apartment. Under these circumstances, when Detective Bayas heard the noise, he had a well-founded, objectively reasonable, articulable fear that a person carrying a gun might be in the other room, thus posing an immediate risk to officers and occupants of the apartment. These circumstances meet the exigent circumstances requirement for warrantless entry into the bedroom and the protective search of the closet. Moreover, the search did not extend beyond what was necessary to locate the source of the noise heard by Bayas and to determine there was no immediate threat of danger.
Under the totality of the circumstances present in this case, the warrantless search of the bedroom closet was not an unreasonable search in violation of the Fourth Amendment. Because the search produced no tangible evidence but produced only the person of Wadada Delhall, we turn next to Delhall’s argument that once he was found in the apartment, he was unlawfully placed under arrest by the actions of the officers, without a warrant or probable cause, thereby tainting his later confession at the police station.
The officers testified at the suppression hearing and at trial that they did not arrest Delhall at the apartment, and they told him several times, both in the apartment and at the police station, that he was not under arrest. The evidence established that Delhall went with the officers willingly, without handcuffs or other restraints. Delhall now contends his belief about whether he would have been free to leave was dictated by the fact that he was taken from his bedroom by the police, at gunpoint, in handcuffs, in the presence of police officers scattered about his apartment and parking lot. He cites the fact that police told him that they wanted to question him about a murder and that, once at the police station, he was not told he was free to leave and was given Miranda warnings. However, Detective Butchko testified that he told Delhall at least three times that he was not under arrest. Butchko also testified that if Del-hall had demanded to leave, they would have stopped questioning him and let him go, but that Delhall never said he wanted to leave or that he did not want to be questioned further.
The officers were in Delhall’s apartment with the consent of Tiese Caldwell, an occupant. Due to exigent circumstances, the police discovered him hiding in a closet in the bedroom. Because evidence established that the police did not know who he was and did not know if he was armed, a temporary investigatory detention was reasonable under all the circumstances present. We reiterated in Taylor v. State, 855 So.2d 1 (Fla.2003), the three levels of encounter that a person may have with law enforcement. The first level is a consensual encounter that involves only minimal contact. Id. at 14. The second *153 level, an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), allows the police to temporarily detain a person if the officer has a reasonable, well-founded, and articu-lable suspicion that the person has committed or is about to commit a crime. See Taylor, 855 So.2d at 15. The third level is an arrest, which must be supported by probable cause. Id.
When Delhall was discovered in the closet, officers reasonably concluded that he may have been one of Negus’s brothers and thus may have been armed. The officers had reasonable concern and articulable well-founded suspicion that the individual may have committed or been present at the McCrae murder. At a minimum, the police had reasonable grounds to believe that the individual hiding in the closet might take violent action based on the fact that he was hiding from police in the first instance. As the officers testified, when they learned that he was Wadada Delhall and that he was unarmed, his handcuffs were removed. Competent, substantial evidence established that he voluntarily accompanied the detectives to the police station. Evidence further established that he was transported in an unmarked car without handcuffs and was not handcuffed at the station until after he confessed. Further, officers testified that Delhall was told several times that he was not under arrest. Based on the totality of the circumstances in this case, we find that Delhall was not unlawfully arrested at his apartment or when he was taken to the police station.
Even if, based on the totality of the circumstances, it can be said that the interview at the police station was actually a custodial interrogation after a seizure or detention, the question is not a Fifth Amendment issue concerning whether Delhall was questioned without being advised of Miranda — Delhall actually complains that he was advised of his Miranda rights too many times. The question raises a Fourth Amendment issue concerning whether Delhall was essentially under arrest at the police station, without probable cause, before he confessed. “[R]ights under the two Amendments may appear to coalesce since ‘the “unreasonable searches and seizures” condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment.’” Brown v. Illinois, 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (quoting Boyd v. U.S., 116 U.S. 616, 633, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). The Supreme Court has made clear that Miranda warnings do not remedy a Fourth Amendment violation. Brown, 422 U.S. at 601, 95 S.Ct. 2254. Where an illegal arrest precedes the confession, the pertinent inquiry is not whether Miranda warnings were given, but whether the statement is truly voluntary. Brown, 422 U.S. at 601-02, 95 S.Ct. 2254. The Supreme Court explained:
In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun [v. U.S., 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be “sufficiently an act of free will to purge the primary taint.”
Id. at 602, 95 S.Ct. 2254 (quoting Wong Sun, 371 U.S. at 486, 83 S.Ct. 407). “No single fact is dispositive.” Brown, 422 U.S. at 603, 95 S.Ct. 2254. Miranda warnings are a pertinent factor, as are the temporal proximity of the arrest and confession, the presence of intervening circumstances, and the purpose and flagrancy *154 of the official misconduct, but “the volun-tariness of the statement is the threshold requirement.” Id. at 603-04, 95 S.Ct. 2254. The Supreme Court noted in Brown that the illegal arrest in that case was separated from the confession by only two hours, with no significant intervening event. Id. at 604, 95 S.Ct. 2254. Additionally, the impropriety of the arrest was noted and the actions of the police were “calculated to cause surprise, fright, and confusion.” Id.
In the instant case, Delhall went voluntarily to the police station without handcuffs and spoke to several officers at length. No threat or force was used. He was not handcuffed during the interview. The intervening event which could reasonably have precipitated his confession was learning that Marcia Berry, his alibi witness, did not support his claim that he was with her when McCrae was killed. Thus, under Brown, the totality of the circumstances tends to show that even if at some point in the consensual interview Delhall was “arrested,” his confession was still voluntary and sufficiently an act of free will to purge any taint of an illegal arrest.
Finally, competent substantial evidence supports the conclusion that the police did have probable cause to arrest Delhall, give him Miranda warnings, and proceed to obtain a confession. We recently explained:
The Supreme Court has further explained that probable cause is a “fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.” Maryland v. Pringle, 540 U.S. 366, 370-71, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
State v. Hankerson, 65 So.3d 502, 506 (Fla.2011). The evidence in this case established that the police knew one of Negus’s brothers shot McCrae and that two individuals drove to the crime scene in a car matching Marcia Berry’s car. Delhall physically matched the description of the shooter given by witnesses. The police knew brother Bobo was in jail at the time and brother Jamal was a young teen. Thus, Atiba was the only likely other brother who could have been a viable suspect along with Wadada. Even if police were not sure which brother did the shooting, they had reasonable grounds to believe Wadada was either the shooter or the driver. “Probable cause to arrest exists when facts and circumstances within an officer’s knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has [been] or is being committed.” Caraballo v. State, 39 So.3d 1234, 1246 (Fla.2010) (quoting Chavez v. State, 832 So.2d 730, 747-48 (Fla.2002) (quoting McCarter v. State, 463 So.2d 546, 548-49 (Fla. 5th DCA 1985))). The facts and circumstances known to the officers were sufficient to warrant a person of reasonable caution to believe that Delhall was involved in the McCrae shooting.
We also conclude that the statements were given after Delhall waived his right to remain silent. There is no dispute that Delhall was given his Miranda warnings, both by Detective Butchko and by William Clifford. There is no evidence to indicate that Delhall’s statements to police were anything but voluntarily and freely given. For all of the above reasons, relief is denied on this claim.
The 9mm Cartridge Found in the Mazda
Delhall next contends that the trial court erred in admitting evidence of *155 the 9mm cartridge found in a backpack in Marcia Berry’s Mazda less than a week after the McCrae shooting. He contends that the cartridge was irrelevant because it was not shown to be related to crimes charged and was unduly prejudicial. “In Florida, all relevant evidence is admissible, unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” Miller, 42 So.3d at 224; see also § 90.402-.403, Fla. Stat. (2008). “An appellate court will not disturb a trial court’s determination that evidence is relevant and admissible absent an abuse of discretion.” McGirth v. State, 48 So.3d 777, 786 (Fla.2010). A trial court’s discretion is limited by the rules of evidence and the principles of stare decisis. Johnson v. State, 969 So.2d 938, 949 (Fla.2007).
We conclude that the trial court did not abuse its discretion in admitting the evidence. The 9mm cartridge was found in the Mazda driven by Delhall, and was located in a backpack containing other items related to Delhall. In his oral confession, Delhall told Butchko that he carried two firearms in that car — a .38 revolver and a 9mm semiautomatic — both of which he used to shoot McCrae. Evidence showed that Delhall had possession of the car at the time of the shooting. McCrae was shot with 9mm ammunition made by various manufacturers, although not the manufacturer of the 9mm ammunition in the backpack. Finally, Delhall was charged with both murder and possession of a firearm by a convicted felon. Evidence that the round of ammunition, which matched the caliber of ammunition fired at McCrae, was found in the Mazda — and evidence that Delhall admitted transporting the 9mm murder weapon in the Mazda — provides the necessary nexus to both the charge of murder and the charge of possession of a firearm by a convicted felon.
Even if the unfired 9mm cartridge was irrelevant and should not have been admitted, any error is harmless beyond a reasonable doubt. The evidence established that Delhall fired more than a dozen rounds of ammunition during the murder, and he confessed to the murder. There is no reasonable possibility that the admission of one unfired cartridge found in the Mazda affected the verdict. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
McCrae’s Statement to Officer Hufnagel
Delhall contends that the trial court erred in admitting into evidence Hubert McCrae’s statements to police at the scene of the shooting. A trial judge’s ruling on the admissibility of evidence will not be disturbed absent a clear abuse of discretion. See Valle v. State, 70 So.3d 530, 546 (Fla.2011). The trial judge’s discretion is limited, however, by the rules of evidence and by the principles of stare decisis. McDuffie v. State, 970 So.2d 312, 326 (Fla.2007) (citing Johnston v. State, 863 So.2d 271, 278 (Fla.2003)). The court’s discretion is also abused if “its ruling is based on an ‘erroneous view of the law or on a clearly erroneous assessment of the evidence.’ ” McDuffie, 970 So.2d at 326 (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). Thus, our first inquiry is whether the statements were inadmissible hearsay or whether they met some exception to the rule excluding hearsay under Florida law. The trial court concluded that the statements met the excited utterance exception to hearsay under section 90.803(2), Florida Statutes (2008). In Hudson v. State, 992 So.2d 96 (Fla.2008), we explained that:
[T]o qualify as an excited utterance, the statement must be made: (1) “regarding an event startling enough to cause ner *156 vous excitement”; (2) “before there was time to contrive or misrepresent”; and (3) “while the person was under the stress or excitement caused by the event.”
Id. at 107 (quoting Henyard v. State, 689 So.2d 239, 251 (Fla.1996)). In this case, McCrae had been shot shortly before police arrived, his statements related to the event, the event was sufficiently startling, and there is no evidence of time for reflection. Thus, the trial court was correct in determining the statements to be admissible excited utterances. Even so, the inquiry now turns to whether the statements were testimonial and thus inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny. As explained below, McCrae’s statements were not testimonial under recent Supreme Court precedent, and thus did not violate the Confrontation Clause contained in the Sixth Amendment to the United States Constitution.
Testimonial Out-of-Court Statements under Crawford
The United States Supreme Court held in Crawford that testimonial hearsay that is introduced against a defendant violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior meaningful opportunity to cross-examine that witness. 541 U.S. at 68, 124 S.Ct. 1354. The Court left “for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ” Id. The Supreme Court subsequently explained in Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006):
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 822, 126 S.Ct. 2266 (emphasis added). The ongoing emergency in Davis was the fact that when the domestic violence victim made the statements to police via a 911 call, her assailant was still in the home threatening her. The Supreme Court in Davis held the 911 statements to be non-testimonial and thus admissible. The Court distinguished the circumstances in Davis from those in Crawford, where the statements were made in a formal interrogation hours after the events. See Davis, at 827, 126 S.Ct. 2266. In the instant case, McCrae’s statements were neither made while McCrae was still being threatened by the assailant, nor were they made in a formal interview given hours after the crime like Crawford. However, because the statements were made at the scene shortly after the shooting, before emergency personnel arrived and while McCrae was injured, and because the perpetrator had just left the scene while still shooting from the window of the car — circumstances indicating a possible ongoing emergency — McCrae’s statements are more akin to those in Davis than in Crawford.
This assessment is borne out by the recent decision of the United States Supreme Court in Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In Bryant, the Supreme Court held that statements made in response to police questioning by a gunshot victim found by police were not testimonial and therefore were not barred by the Confrontation Clause. Id. at 1150. The shooting in Bryant had occurred about twenty min *157 utes earlier at another location, and the victim had driven himself to a gas station where he was found. Id. When the officer asked the victim “what had happened, who had shot him, and where the shooting had occurred,” the victim told police “Rick” had shot him, indicating the appellant, Richard Bryant. Id. Emergency services then arrived and the victim was transported to the hospital where he died. Id. The police left the scene and traveled to Bryant’s house where they found blood, a bullet hole in the door, and the victim’s wallet inside the house. Id.
The United States Supreme Court held in Bryant, as it did in Crawford and Davis, that the reach of the Confrontation Clause is limited to testimonial statements. Bryant, 131 S.Ct. at 1153. The Court recognized that it had not comprehensively defined testimonial statements in Crawford and that in Davis it “took a further step to ‘determine more precisely which police interrogations produce testimony.’ ” Bryant, 131 S.Ct. at 1153 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266). Even so, the Court in Bryant commented that Davis did not set forth an exhaustive classification of all conceivable statements as either testimonial or nontestimonial. Bryant, 131 S.Ct. at 1155. The Supreme Court explained: “When, as in Davis, the primary purpose of an interrogation is to respond to an ‘ongoing emergency,’ its purpose is not to create a record for trial and thus is not within the scope of the Clause.” Id. The Court then expanded this concept, stating:
But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose [of creating an out-of-court substitute for testimony] exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.
Bryant, 131 S.Ct. at 1155 (bracketed material added).
Thus, Bryant focuses to a large degree on whether the statement was elicited primarily to create an out-of-court substitute for testimony. The Court in Bryant also recognized that the circumstances of Davis, where the domestic violence assailant was still threatening the victim, happened to be the factual situation at hand in that case, but may not be the only context in which statements will be found to be nontestimoniah The Court explained, “We now face a new context: a non-domestic dispute, involving a victim found in a public location, suffering from a fatal gunshot wound, and a perpetrator whose location was unknown at the time the police located the victim.” Id. at 1156. The Court stated that this “new context requires us to provide additional clarification with regard to what Davis meant by ‘the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.’ ” Id. at 1156 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266).
The Court in Bryant also explained that Davis was not intended to define the outer bounds of an ongoing emergency. See Bryant, 131 S.Ct. at 1158. The Court then expanded the inquiry for an ongoing emergency, which it held was a context-specific inquiry, and stated: “An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.” Id. at 1158. Thus, Bryant supports the conclusion that *158 an ongoing emergency existed when Del-hall left the scene firing a shot out of the window of the car.
The Supreme Court held in Bryant that “[as] Davis made clear, whether an ongoing emergency exists is simply one factor — albeit an important factor — that informs the ultimate inquiry regarding the ‘primary purpose’ of an interrogation.” Bryant, 131 S.Ct. at 1160. The formality or informality of the police inquiry of the victim is another factor. The questioning in Bryant, which occurred in a disorganized fashion outdoors prior to the arrival of medical services, was an important factor in distinguishing that interrogation from formal in-house interrogation and in determining the primary purpose of police questioning. See id. The Supreme Court also distinguished Bryant from Davis and Crawford by noting that Bryant was the first post-Crawford Confrontation Clause case to involve a gun. See Bryant, 131 S.Ct. at 1164. Where a gun is concerned, the fact that the shooter is not present does not necessarily signify an end to a possible threat: “An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim.” Id.
The Supreme Court applied the above principles to the facts in Bryant to determine if the primary purpose of the police questioning and victim statements was “to enable police assistance to meet [the] ongoing emergency.” Id. at 1165 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266). That inquiry in Bryant resulted in the conclusion that the victim’s statements to police in response to the question of “what had happened” served the primary purpose of assisting police to respond to an ongoing emergency and were not testimonial. Noting that the victim was obviously in considerable pain and having difficulty breathing and talking, the Supreme Court could not say that a person in the victim’s situation “would have had a ‘primary purpose’ ‘to establish or prove past events potentially relevant to later criminal prosecution.’ ” 131 S.Ct. at 1165 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266). The Court pointed out that the question to the victim in Bryant asking “what had happened” was precisely the type of question that would allow police to assess the situation, including the threat to their own safety and possible danger to the victim and to the public. Id. at 1166. Thus, the statements in Bryant were held to be “the type of nontestimonial statements we contemplated in Davis ” and were not barred by the Confrontation Clause. Id. at 1166.
In light of the holding in Bryant, and its similarity to the instant case, this Court finds that McCrae’s statements to Officer Hufnagel, admissible under Florida law as excited utterances, were not testimonial and thus not barred by the Confrontation Clause. Thus, relief is denied on this claim.
Admission of McCrae’s Affidavit Concerning the Bennett Murder
Delhall also contends that the trial court erred in allowing into evidence the affidavit that Hubert McCrae made in the Bennett murder case. That affidavit was originally admitted into evidence at Negus Delhall’s Arthur hearing and was read into evidence in this case. It stated:
1. I operate an auto repair business located at 2143 Opa Locka Boulevard, Miami Dade County.
2. I was a witness to the shooting of Gilbert Bennett on April 24th, 1998.
3. I gave a sworn statement to Detective Ray Hoadley in the evening of April 24th, 1998, and answered all of the detective’s questions.
4. I viewed a photo line-up on April 29th, 1998, and identified a photograph *159 of the man I saw enter my business and shoot Gilbert Bennett on April 24th, 1998. I indicated my choice by, among other things circling the photograph of the shooter on the line-up and signing my name below it, noting the date and the time.
Hubert McCrae, Affiant.
Delhall argues that this affidavit was inadmissible testimonial hearsay in violation of the Confrontation Clause, contrary to the holding of Crawford. The Court in Crawford did not define “testimonial statements,” but noted that statements such as prior testimony at a hearing, trial, or before a grand jury, and statements given in police interrogations, would violate the Confrontation Clause unless certain conditions for admission were met. See Crawford, 541 U.S. at 51, 124 S.Ct. 1354. The affidavit in this case was without doubt testimonial.
However, in the instant case, Delhall has not identified any pretrial motion or contemporaneous objection in which he raised an express Confrontation Clause objection to admission of the McCrae affidavit. The main ground argued at trial was that the out-of-court statements were unreliable hearsay. In order to preserve a Crawford objection to hearsay as violative of the Confrontation Clause, “a specific objection is necessary.” Williams v. State, 967 So.2d 735, 747 n. 11 (Fla.2007) (citing Schoenwetter v. State, 931 So.2d 857, 871 (Fla.2006)). The defendant must object on the grounds that admission of the out-of-court statement will violate the defendant’s right to confront witnesses; it is not sufficient to object to the statements as inadmissible hearsay. Id. Thus, an express Crawford objection was not preserved by Delhall’s hearsay objection made during trial. Even assuming the objection was sufficiently preserved by counsel’s passing reference to “Crawford” at the pretrial hearing, we conclude that a Crawford violation did not occur in this case.
The Supreme Court in Crawford stated that the Confrontation Clause “does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.” Crawford, 541 U.S. at 60 n. 9, 124 S.Ct. 1354 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). When analyzed solely under Florida “hearsay” law, i.e., whether it is an out-of-court statement offered in court for the truth of the matter asserted, it can be seen that McCrae’s affidavit was not inadmissible hearsay and thus is not barred by the Confrontation Clause. The McCrae affidavit was offered in Wadada’s trial not to prove that McCrae actually did see Negus Delhall kill Bennett or that McCrae actually picked a photograph of Bennett’s killer out of a photo array, as the affidavit indicates. The affidavit was not offered to prove the truth of the allegations against Negus but to prove that Delhall had a reason to believe McCrae would be a witness against Negus, regardless of the veracity of the allegations in the affidavit. This provided evidence of Delhall’s motive for murdering McCrae.
We reached a similar conclusion in Smith v. State, 7 So.3d 473, 497 (Fla.2009). In Smith, the defendant was tried for killing Cynthia Brown, who was to be the sole witness against Smith in a separate murder case. Id. at 485. Smith involved admissibility of a report found in Smith’s possession which contained Brown’s out-of-court statements to police in which she said she witnessed the earlier murder by Smith. We held the report was not inadmissible hearsay because it was not offered to prove the truth of Brown’s statement about witnessing the murder, but to prove that Smith had a motive to kill *160 Brown to keep her from testifying. See Smith, 7 So.3d at 497-98. Similarly, in the instant case, McCrae’s affidavit was not admitted to prove Negus killed Bennett. It was admitted to prove Wadada Delhall’s knowledge of McCrae as a possible witness against Negus, thus proving a motive for killing McCrae. Delhall admitted that he learned about McCrae from Negus’s first lawyer, who had attended the Arthur hearing where the affidavit was presented. Because the McCrae affidavit was not offered to prove the truth of the matter asserted — that McCrae actually identified Negus as Bennett’s murderer — but was only offered to show that Delhall had reason to believe McCrae was an eyewitness who would testify against his brother, admission of the McCrae affidavit did not violate the Confrontation Clause or the principles of Crawford. Thus, relief is denied on this claim.
Delhall’s Booking Sheet
Delhall next contends that the trial court erred in excluding evidence of a Broward County Jail booking sheet that showed he was in jail at the time of Negus’s Arthur hearing. The defense raised a factual issue as to when Delhall learned that McCrae was the only eyewitness to the Gilbert Bennett murder, for which Negus Delhall was arrested. The Arthur bond hearing for Negus Delhall was held on September 6, 2001. The McCrae affidavit was presented at the bond hearing where Negus was present with his attorney Paul Gerson, and Hubert McCrae’s name was mentioned as the only eyewitness.
In an apparent attempt to dispel the idea that he learned about McCrae from attending the Arthur hearing, Delhall, who appeared in his own defense during the guilt phase, testified that he did not attend the hearing and, further, that he was in jail on the date of the hearing and did not get out until September 7, 2001. On cross-examination, the prosecutor asked Delhall if he had proof with him that day that he was incarcerated on September 6, 2001, and Delhall replied that he did. On redirect examination, defense counsel sought to admit, for identification, a booking sheet from the Broward County Sheriffs Office showing Delhall was in custody for a minor offense from August 27 to September 7, 2001, when he was released at 7:38 pm. When the prosecutor objected, the trial court asked her if there was any real dispute over the date. In response, the prosecutor simply objected on the grounds that it was never disclosed in discovery and was a Richardson violation. The prosecutor also contended that she had no way to investigate its authenticity. Defense counsel responded that there was no real prejudice to the State because a brief computer check on the prosecutor’s own computer would verify the accuracy of the document, and further asked for a short continuance to obtain documentation of the authenticity of the booking sheet.
Where a discovery violation occurs, we held in Richardson v. State, 246 So.2d 771 (Fla.1971), that the trial court must conduct an inquiry as to whether the violation: (1) was willful or inadvertent; (2) was substantial or trivial; and (3) had a prejudicial effect on the aggrieved party’s trial preparation. Id. at 774-75. This Court will review the record to determine if the inquiry was properly made and if the trial court’s actions pursuant to the inquiry were proper. See McDuffie, 970 So.2d at 321. “A trial court’s decision on a Richardson hearing is subject to reversal only upon a showing of abuse of discretion.” Conde v. State, 860 So.2d 930, 958 (Fla.2003). However, if the trial court abused its discretion in excluding the evidence as a sanction, thus erring, this Court will conduct a harmless error analysis.[8] *161 McDuffie, 970 So.2d at 322. Often, a Richardson violation involves a discovery violation by the State. The same rules apply, however, regardless of which party is at fault. The following questions will be examined in turn: Whether the trial court conducted an adequate Richardson inquiry; whether the trial court erred in excluding the booking sheet; and whether any error was harmless beyond a reasonable doubt.
In response to the trial court’s ruling that a discovery violation had occurred, defense counsel argued first that there was no way he could have anticipated that the State would ask the question and then demand proof. He stated, “They said what proof. Now I am being put in a position that this jury doubts my client because of [the] question posed by the prosecutor on a death penalty case.” The trial court also noted that there was no custodian of records listed to testify about the booking sheet, although defense counsel’s motion for a short continuance to call a custodian witness was denied.
As to possible prejudice to the State in preparation of its case, the prosecutor argued only that she would not have challenged Wadada to produce proof if she had been given the booking sheet. The trial court did not make any express finding that the violation was willful or that the State was substantially prejudiced, but stated:
THE COURT: Listen, this is a Richardson violation. There is absolutely no reason why this should not have been given to the prosecutor, if you had it at some point, other than right at this moment. Certainly before the case. Not the case necessarily, certainly before the defendant began his testimony I’m having to assume you had it in your hands before that. It just didn’t come in over the banister after she asked that question.
The court finally ruled that this is “a Richardson violation so it’s inadmissible at this time.” The court refused to admit the Broward booking sheet, but Delhall was allowed to testify again that he was in jail in Broward County on September 6, 2001, and did not get out until September 7, 2001. Delhall also testified that counsel had refreshed his recollection of the date he was released by showing him some documents from the Broward County Sheriffs office. The State did not attempt to put on any evidence or testimony to dispute that fact.
Richardson Inquiry
The trial court did not announce that it was engaging in a Richardson inquiry, but the discussion between the court and counsel qualified as a limited Richardson inquiry. Even so, the court did not make specific findings concerning the willfulness of the violation or the substantial prejudice to the State. As explained next, the trial court abused its discretion in excluding the booking sheet as a sanction for a Richardson violation. The question of whether the error was harmless is discussed later in this issue.
First, defense counsel’s explanation for not providing the booking sheet in discovery was essentially that he could not have anticipated that the State would demand evidentiary proof of the jail stay when Wadada was on the witness stand. Thus, it appears that even though defense counsel could have provided the booking sheet prior to Delhall’s testimony, counsel’s fail *162 ure to do so was not clearly shown to be willful nondisclosure. Second, in light of the nature of the document sought to be introduced — a simple booking sheet that the prosecutor could easily verify — the violation was not shown to be substantial. Moreover, the State presented nothing to compel a conclusion that failure of the defense to provide the booking sheet substantially prejudiced the State in the preparation of its case, as Richardson requires. The most that the prosecutor argued at trial and in this Court is that she would not have asked the question about the existence of proof if she had been given the booking sheet.
“[T]he failure of either the State or a defendant to comply with a discovery deadline, standing alone, is not dispositive for purposes of determining whether the sanction of exclusion of a witness or other evidence is appropriate” and the inquiry must involve a determination of whether the violation resulted in substantial prejudice to the opposing party. State v. Randal, 947 So.2d 609, 613 (Fla. 3d DCA 2007). Here, the defense committed the discovery violation, but it was incumbent upon the State, as the aggrieved party, to show substantial and material prejudice to its trial preparation if the evidence is admitted. The trial court incorrectly accepted “surprise” as sufficient prejudice. The State contends that its case did not hinge on proof that Delhall attended the bond hearing to learn about the McCrae affidavit. Thus, if there was no legitimate issue concerning whether Delhall attended the bond hearing, it is difficult to see how the State was substantially prejudiced by proof that he could not have done so. Whether Delhall was unfairly prejudiced by the exclusion of the booking sheet is discussed separately below. We turn next to whether exclusion of the booking sheet was an abuse of discretion.
Error in Exclusion of the Booking Sheet
Florida Rule of Criminal Procedure 3.220(n)(l) allows a trial court to exclude evidence for a violation of discovery rules, but exclusion “should only be imposed when there is no other adequate remedy.” McDuffie, 970 So.2d at 321; see also Rimmer v. State, 59 So.3d 763, 787 (Fla.2010). In McDuffie, which also involved a Richardson violation by the defense, we explained:
Where the issue involves possible exclusion of defense evidence, the “extreme sanction of excluding [defense] evidence ... should be used only as a last resort” and “it is incumbent upon the trial court ... to determine whether any other reasonable alternatives can be employed to overcome ... possible prejudice,” including declaration of a mistrial....
[[Image here]]
When, as in this case, the discovery violation is committed by the defense, special importance attaches to the trial court’s inquiry into alternative sanctions because exclusion of exculpatory evidence implicates the defendant’s constitutional right to defend himself or herself.
McDuffie, 970 So.2d at 322 (citations omitted).
It is well-settled that when a discovery violation is committed by the State, exclusion of the evidence is viewed as an extreme sanction to be employed only as a last resort and only after the court determines no other reasonable alternative exists to overcome the prejudice and allow the witness to testify. See, e.g., Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976). As expressed in McDuffie, this rule applies with equal or greater force when a defense witness or evidence is sought to be *163 excluded for a defense discovery violation, because there are few rights more fundamental than the right of an accused to present evidence or witnesses in his own defense. 970 So.2d at 321. The “extreme sanction of excluding [defense] evidence” should be used only as a last resort and it is incumbent upon the trial court to determine whether any other reasonable alternatives can be employed to overcome possible prejudice. McDuffie, 970 So.2d at 322 (quoting Casseus v. State, 902 So.2d 294, 295 (Fla. 4th DCA 2005)).[9] Here, exclusion of the evidence was actually the first resort, not the last. Defense counsel asked for but was denied a brief continuance to authenticate the document to the satisfaction of the State. Counsel also suggested the State could perform a computer check to verify the accuracy of the evidence sought to be introduced. These options were rejected.
Even though the prosecutor was surprised at the submission of the booking sheet at that point in the proceedings, she did initially challenge Delhall on the witness stand to produce hard proof at that time — proof that defense counsel was willing and anxious to provide. The trial court did not make an adequate inquiry into any possible alternatives to the drastic sanction of exclusion. Thus, the trial court abused its discretion in excluding the defense evidence as a sanction for a Richardson violation.
Harmless Error Analysis
Even though the trial court erred in excluding the booking sheet as a sanction, we must determine if the error was harmless. “This Court has defined the harmless error test as placing ‘the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.’” Ibar v. State, 938 So.2d 451, 466 (Fla.2006) (quoting DiGuilio, 491 So.2d at 1135).
The State correctly argues that although it contended throughout trial that Delhall’s motive for killing Hubert McCrae was to eliminate the only eyewitness to Negus’s murder of Gilbert Bennett, the State did not contend that Wadada learned of the witness by attending Negus’s bond hearing. In the State’s opening statement, the prosecutor argued that after the bond hearing at which McCrae’s affidavit was presented, “it was at this point that the defendant decided to take matters into his own hands. He met with the lawyer and he found out why his brother had been denied bond_Hubert McCrae’s affidavit was now public record.” Although Paul Gerson, the lawyer hired for Negus by Delhall, later testified that he could not recall Wadada coming to him after the bond hearing to ask what happened, Del-hall told William Clifford that he learned about McCrae from Gerson.
In the closing arguments, the State again noted, “So this defendant had to find out who this witness was because the lawyer wasn’t helping. The lawyer didn’t do well. So he fired the lawyer, got the information that he could, Hubert McCrae. Did he read the affidavit? Did he see the affidavit? Doesn’t matter because he started looking for Hubert McCrae and you know that from Clarence Gooden because he is looking for whoever is Hubert McCrae.... That’s what this defendant knew.”
*164 The State’s case did not hinge on proving that Delhall attended the bond hearing. In any event, Delhall testified several times that he did not attend the bond hearing and was in jail on that date. That evidence, in the form of his testimony, was presented to the jury. The State introduced Delhall’s confession and other evidence proving Delhall guilty of murdering McCrae. Therefore, there is no reasonable possibility that the error in excluding the paper documentation that Delhall was in jail on the date of the Arthur hearing contributed to his conviction. Because the error in excluding the booking sheet was harmless beyond a reasonable doubt, relief is denied on this claim.
Evidence Concerning the Bennett Murder
Delhall next contends that the trial court erred in allowing admission of a substantial amount of evidence through a number of different witnesses concerning the Gilbert Bennett murder, including a photograph of Bennett’s dead body lying in a pool of blood. Delhall also contends that the trial court erred in failing to recognize the validity of his objection during his cross-examination when the prosecutor stated, as a preamble to a question, that Delhall participated in the Bennett murder. We agree that admission of the extensive evidence of the Bennett murder, along with the prosecutor’s improper remark during cross-examination, were error. As explained more fully below, even though we conclude these errors were harmless beyond a reasonable doubt as to the guilt phase, when considered cumulatively with error that occurred in the penalty phase, these errors cumulatively require that a new penalty phase be held. We first examine the errors in the guilt phase concerning the Bennett murder.
During cross-examination of Delhall in the guilt phase, the prosecutor asked if he, along with his brother Atiba and three other individuals, dealt drugs out of a place in the warehouse district where the Bennett and McCrae murders occurred. The prosecutor also asked Del-hall to confirm that an individual named Conroy Turner “ripped you guys off for drugs” and asked Delhall to confirm that his brother, Negus, took a contract to kill Conroy Turner. The prosecutor then asked:
Q. You couldn’t find Conroy Turner so you killed Richie B [Bennett] his best friend unless Richie told you where Con-roy was to be found?
MR. LENAMON [DEFENSE COUNSEL]: Objection, sidebar.
A. No, sir. Who Richie B?
Q. Richie B’s best friend was Conroy Turner. Conroy Turner ripped you guys off for some dope and your brother agreed to kill Richie B because Richie B wouldn’t say where Conroy Turner could be found so that Conroy Turner could pay you back for the dope that he ripped off.
A. I don’t know who that was Con-roy Turner.
Q. You know who Richie B was?
A. After they start showing me pictures of the dude.
Q. After your brother took the contract to kill him and after your brother killed him?
A. No.
Q. Your brother killed him right in that auto shop right there that day with his shirt off showing his tattoos, something you don’t have, right.
That’s why they knew it was your brother and not you?
A. Wrong.
Q. You don’t have those kind of tattoos that your brother has?
*165 A. No.
Q. He has tattoos all over his back, doesn’t he?
A. No.
Q. Across his back?
A. He has one tattoo from what I remember.
Q. An[d] once, once you found out and your brother found out that he was wanted by the police in Miami Dade County and there was a warrant for his arrest for the murder of Richie B, someone actually cared that Richie B was killed, you didn’t figure on that did you, Mr. Delhall?
A. I don’t know nothing about what you talking about.
MR. LENAMON [defense counsel]: Objection, I have a motion to make.
THE COURT: Do you. Come sidebar.
[Thereupon, counsel for the respective parties approached the Bench and conferred with the Court outside the hearing of the jury and the following proceeding was held:]
THE COURT: What’s the motion?
MR. LENAMON: Judge I’m moving for a mistrial. Miss Levine is indicating my client was involved in another homicide.
THE COURT: She never said that.
MR. LENAMON: I think she did.
THE COURT: She did not.
MR. LENAMON: I believe she did.
THE COURT: I believe she didn’t. Is that the motion?
MR. LENAMON: That’s the motion. I’m going to have a continuing objection to anything about my client having any involvement in any other homicide.
THE COURT: Okay motion is denied.
(emphasis added). After failing to recognize that the prosecutor had, in fact, stated that Delhall was involved in the Bennett murder, the trial court denied the motion for mistrial. Where, as here, counsel simultaneously objects to an improper comment and moves for mistrial without obtaining a ruling on the objection, the standard of review of denial of the mistrial is abuse of discretion. Poole v. State, 997 So.2d 382, 391 n. 3 (Fla.2008) (citing Dessaure v. State, 891 So.2d 455, 464-65 n. 5 (Fla.2004)). “A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding.” Wade v. State, 41 So.3d 857, 872 (Fla.2010) (quoting Floyd v. State, 913 So.2d 564, 576 (Fla.2005)).
The strong implication during cross-examination that Delhall was involved in Bennett’s murder was improper. This Court has long held that it is improper “to inject into the cross-examination of the defendant appearing as a witness in his own behalf veiled innuendoes and suggestions of general criminality.” Messer v. State, 120 Fla. 95, 162 So. 146, 147 (1935). Further, we have stated:
It is well settled that the prosecution in a criminal case cannot call witnesses to impeach the character of the defendant, unless the defendant puts it in issue. Nor can the prosecution accomplish the same forbidden end by indirection through pursuing a method of questioning defendant and his witness on cross-examination that is principally designed, by means of innuendo and suggestions of general criminality on accused’s part, to lead the jury to believe that the accused should be found guilty of the particular crime charged, because of his being suspected or accused of other offenses, or because of his connections or associations with other accused persons under indictment for different *166 crimes not constituting a part of the charge on trial.
Foy v. State, 115 Fla. 245, 155 So. 657, 658 (1934) (citation omitted). In the present case, the prosecutor’s question violated the rule laid down in Messer and Foy in that it suggests criminality on Delhall’s part, and specifically accuses him of the murder of Gilbert Bennett, a murder for which he was not on trial. While the State’s case did involve the necessary presentation of some information about the Gilbert Bennett murder in order to show Delhall’s motive for killing the eyewitness to that murder to protect Negus, such proof did not require either allegations or proof that Delhall killed Bennett, or innuendo that he was involved in its planning or was present when it occurred.
As to the guilt phase, we conclude that although the comments suggesting that Wadada Delhall was involved in the murder of Bennett were highly improper, they were not repeated in the prosecutor’s subsequent cross-examination of Delhall. These comments, standing alone, did not vitiate the entire guilt phase or deprive Delhall of a fair guilt-phase proceeding when considered in light of all the other evidence. Thus, the trial court did not abuse its discretion in denying the motion for mistrial. However, this error may be viewed cumulatively with other error that occurred in admission of evidence highlighting the Bennett murder. “Where multiple errors are discovered in the jury trial, a review of the cumulative effect of those errors is appropriate because ‘even though there was competent substantial evidence to support a verdict ... and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation.’” McDuffie, 970 So.2d at 328 (alterations in original) (quoting Brooks v. State, 918 So.2d 181, 202 (Fla.2005)).
Delhall also objected to the extent of the evidence submitted to prove circumstances surrounding the Bennett murder. This evidence was not submitted as similar fact evidence pursuant to Williams v. State, 110 So.2d 654 (Fla.1959). Rather, it can be characterized as dissimilar fact evidence pertinent to an issue in the case — Delhall’s motive for killing Hubert McCrae. In discussing the admission of dissimilar fact evidence, we stated in McCray v. State, 71 So.3d 848 (Fla.2011):
This Court has explained that “relevant evidence of collateral crimes impermissi-bly becomes a feature of the trial when the evidence ‘transcend[s] the bounds of relevancy to the charge being tried’ and the prosecution ‘devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.’ ” Peterson v. State, 2 So.3d 146, 155 (Fla.2009) (alteration in original) (quoting Conde v. State, 860 So.2d 930, 945 (Fla.2003)). Where evidence does, in fact, become a feature of the capital trial, reversible error will result. See, e.g., Steverson v. State, 695 So.2d 687, 687 (Fla.1997) (reversing Steverson’s conviction and death sentence because State’s presentation of excessive collateral crime evidence was unfairly prejudicial and became a feature of Steverson’s capital murder trial).
Id. at 877. “Regardless of relevancy of collateral crime evidence ... admissibility is improper where the probative value of the evidence is substantially outweighed by undue prejudice.” Id. (quoting Hodges v. State, 885 So.2d 338, 358 (Fla.2004)).
The evidence concerning the Bennett murder was offered to prove Wadada Del- *167 hall’s motive to kill the witness, Hubert McCrae. We have approved admission of dissimilar fact evidence of other crimes to prove motive in other cases. In Victorino v. State, 23 So.3d 87 (Fla.2009), we found relevant and admissible dissimilar fact evidence showing a continuing chain of violent events leading up to the murders. The evidence showed that Victorino and his codefendants acted as a group in avenging wrongs suffered by the group’s members by attacking a rival group on several occasions. Id. at 99. In Jackson v. State, 25 So.3d 518 (Fla.2009), we approved admission of evidence that the defendant had a history of drug dealing, where the theory of the State’s case was that Jackson killed the victim because the victim stole Jackson’s drugs and money. Id. at 529. In Jorgenson v. State, 714 So.2d 423 (Fla.1998), we approved admission of dissimilar fact evidence that the defendant was a drug dealer because a material issue was Jorgenson’s motive for the murder. The victim had threatened to turn Jorgenson in if he were to cut off her drug supply. Id. at 428.
In the present case, evidence of the facts and circumstances of the Bennett murder investigation were admitted to prove that Wadada had a motive to kill McCrae to protect Negus in that prosecution. However, the State presented a substantial body of evidence concerning the Bennett murder that exceeded the scope of evidence necessary to simply prove that Negus Delhall was charged with the Bennett murder; that Hubert McCrae was the sole eyewitness to the Bennett murder at that time; and that Wadada Delhall thus had a motive to kill Hubert McCrae to protect his own brother. Certainly, the photograph of Bennett’s dead body lying in a pool of blood was not necessary to prove motive on Delhall’s part. We conclude the trial court abused its discretion in admission of the photograph of Bennett’s body. However, reversal is not mandated if the error was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1138. The harmless error test “is not a suffíciency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test” but the “focus is on the effect of the error on the trier-of-fact.” Id. at 1139. Applying this test, and considering how both the permissible and impermissible evidence could have affected the trier-of-fact, we conclude the error is harmless beyond a reasonable doubt as to Delhall’s guilt.
Although we find that the errors in the State’s cross-examination question, which suggested at a minimum that Delhall was involved in the murder of Bennett, and the admission of unnecessarily prejudicial evidence of the Bennett murder were harmless in the guilt phase, we turn next to a discussion of the effect of these guilt phase errors when considered cumulatively with error committed in the penalty phase of the trial.
Improper Prosecutorial Comment in the Penalty Phase
The next claim raised by Del-hall concerns improper prosecutorial comment during penalty phase closing arguments that Delhall contends denied him a fair penalty phase proceeding. We agree. First, the prosecutor argued that Delhall’s mitigation evidence was “excuses.” Del-hall’s objection was sustained, but shortly thereafter the prosecutor again argued that “every single thing that was presented to you in mitigation, which I really think was one thing, stretched it out [to] make it more, but it’s one, it’s an excuse.” Objection to this comment was overruled. “This Court has long recognized that a prosecutor cannot improperly denigrate *168 mitigation during a closing argument.” Williamson v. State, 994 So.2d 1000, 1014 (Fla.2008). In Brooks v. State, 762 So.2d 879 (Fla.2000), we specifically addressed denigration of mitigation as “excuses” and held:
[T]he prosecutor’s characterization of the mitigating circumstances as “flimsy,” “phantom,” and repeatedly characterizing such circumstances as “excuses,” was clearly an improper denigration of the case offered by Brooks and Brown in mitigation.
Id. at 904; see also Franqui v. State, 59 So.3d 82, 98 (Fla.2011) (holding that denigrating mitigation as “make believe” is improper); cf. Cox v. State, 819 So.2d 705, 718 (Fla.2002) (holding that comments “designed to convey the concept that while the mitigator may be valid, perhaps its weight should be somewhat discounted because of the passage of time and the lack of an evidentiary nexus to the defendant” were proper). In the instant case, calling the mitigation “excuses” was not a comment designed to recognize the validity of the mitigation and simply urge less weight. The comment appears designed to invalidate the mitigation entirely by dismissing it as an excuse. While this Court has recognized that comments that are “a fair statement of the evidence produced during the trial and fair rebuttal of the defense closing argument” are proper, see Pagan v. State, 830 So.2d 792, 809 (Fla.2002), the prosecutor’s denigration in this case does not fall in that category of proper comment. As recognized in Brooks, the prosecutor improperly called Delhall’s mitigation “excuses.” 762 So.2d at 904. A similar argument — characterizing the defendant’s mitigation as excuses — was also held to be error in Urbin v. State, 714 So.2d 411, 422 n. 14 (Fla.1998). Thus, the trial court erred in overruling the objection.
Second, the prosecutor argued numerous times, sometimes over objection and sometimes without objection, that Delhall is “violent,” “dangerous,” that he “can’t be fixed,” that “he acts with violence,” and “[fjrom a school child he was violent.” At one point, when the prosecutor argued that Delhall is dangerous, the trial court sustained the objection but the prosecutor simply continued to argue dangerousness. The trial judge then chastised the prosecutor: “You keep saying that word. Don’t do that, okay. Please.” Despite defense counsel’s further objection and request to make a motion, the trial court allowed the prosecutor to proceed. The prosecutor’s next comment was, “His violence speaks for itself. You know what? Sometimes it’s really sad a person can’t be fixed.” She further argued that Delhall deserves the “ultimate punishment” because it’s for the “worst of the worst.” When the court called a recess, defense counsel was allowed to make a motion for mistrial and argued that the prosecutor violated the court’s pretrial ruling that prohibited argument about future dangerousness. Del-hall’s motion was denied.
This Court has held that arguments of future dangerousness as a basis to impose a death sentence are improper and “prosecutorial overkill.” Teffeteller v. State, 439 So.2d 840, 845 (Fla.1983). The State contends that the prosecutor never argued future dangerousness but only commented on the dangerousness of the crime committed and the dangerousness of the prior violent felonies. This is not correct. The above transcript excerpts show arguments that Delhall is a dangerous adult, who was dangerous from the time he was a child, and that he cannot be fixed— all of which suggest a pattern of dangerousness extending into the future. This argument of dangerousness was improper. See, e.g., Brooks, 762 So.2d at 905 (revers *169 ing for a new penalty phase for cumulative error where prosecutor made repeated comments about the violent and vicious nature of the defendant as well as other improper comments).
“A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding.” Wade, 41 So.3d at 872 (quoting Floyd v. State, 913 So.2d 564, 576 (Fla.2005)). For a new trial to be warranted, the comments “must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.” Brooks v. State, 918 So.2d 181, 207 (Fla.2005) (quoting Spencer v. State, 645 So.2d 377, 383 (Fla.1994)).
We conclude that the trial court abused its discretion in denying the motion for mistrial based on the prosecutor’s repeated improper comments on Del-hall’s dangerousness. Our conclusion that a new penalty phase is required is buttressed by the fact that during the guilt phase, the State presented an excess of evidence — some of which was unnecessarily gruesome — concerning the Bennett murder. More importantly, the prosecutor strongly implied during cross-examination of Delhall in the guilt phase first that he actually committed the Bennett murder, and subsequently that he was involved in the planning of the Bennett murder with his brother, Negus. The error in the guilt phase cross-examination, although harmless as to Delhall’s guilt, may be viewed cumulatively with the error in the penalty phase committed by the overzealous prose-cutorial argument that Delhall has always been violent and cannot be fixed, and that his mitigation is nothing but excuses. When reviewing error in prosecutorial argument, it is appropriate to consider the cumulative effect of numerous instances of both objected-to and unobjected-to improper comment. See Brooks, 762 So.2d at 899. This principle is not limited to improper comment. The Court has held that “[w]here multiple errors are found, even if deemed harmless individually, ‘the cumulative effect of such errors’ may ‘deny to defendant the fair and impartial trial that is the inalienable right of all litigants.’ ” Hurst v. State, 18 So.3d 975, 1015 (Fla.2009) (quoting Brooks v. State, 918 So.2d 181, 202 (Fla.2005)); see also McDuffie, 970 So.2d at 328.
We have cautioned in the past that a prosecutor shall not exceed the bounds of proper conduct and professionalism by overzealous advocacy, which is especially egregious in a death case “where both the prosecutors and courts are charged with an extra obligation to ensure that the trial is fundamentally fair in all respects.” Brooks, 762 So.2d at 905 (quoting Gore v. State, 719 So.2d 1197, 1202 (Fla.1998)). “While prosecutors should be encouraged to prosecute cases with earnestness and vigor, they should not be at liberty to strike ‘foul blows.’” Gore, 719 So.2d at 1202 (quoting Berger v. U.S., 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). “When comments in closing argument are intended to and do inject elements of emotion and fear into the jury’s deliberations, a prosecutor has ventured far outside the scope of proper argument. ... In his [or her] determination to assure that appellant was sentenced to death, this prosecutor acted in such a way as to render the whole proceeding meaningless.” Garron v. State, 528 So.2d 353, 359 (Fla.1988).
*170 We are compelled once again to emphasize that the prosecutor has a “duty to seek justice, not merely ‘win’ a death recommendation.” Merck v. State, 975 So.2d 1054, 1068 (Fla.2007) (quoting Urbin v. State, 714 So.2d 411, 422 (Fla.1998)); see also Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985) (“We are deeply disturbed as a Court by the continuing violations of pros-ecutorial duty, propriety and restraint”). The prosecutor in this case, by her overzealous and unfair advocacy, appeared to be committed to winning a death recommendation rather than simply seeking justice. On numerous occasions, as discussed earlier, her improper advocacy continued even after an objection was sustained. In one instance, the judge was forced to step in and specifically admonish her to stop it. Yet, she continued in spite of this admonition.
We find that these cumulative errors so fundamentally tainted the guilt phase that we cannot conclude they did not influence the jury to reach a more severe penalty recommendation than it would have otherwise. This is especially significant in view of the fact that the jury recommended death by a vote of eight to four — a recommendation that was far from unanimous. Because we now vacate DelhalPs death sentence and remand for a new penalty phase proceeding, we do not reach other penalty phase claims raised by Delhall, nor do we reach the issue of proportionality of the death sentence.
CONCLUSION
Based on the foregoing, we affirm Del-hall’s judgment and conviction for first-degree murder. We vacate the sentence of death and remand for a new penalty phase proceeding.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

. It was stipulated during trial that Delhall is a convicted felon.

. The issues raised by Delhall are: (1) error in denial of Delhall’s motion for mistrial based on the prosecutor’s cross-examination of Delhall implicating him in the Gilbert Bennett murder; (2) error in overruling objections to evidence of the Bennett murder; (3) error in overruling objection to McCrae’s affidavit concerning the Bennett murder; (4) error in excluding the Broward County Jail booking report; (5) error in overruling objection to McCrae's statements to Officer Hufna-gel; (6) error in denying motion to suppress Delhall’s statements obtained after search of his bedroom; (7) error in admitting evidence of an unspent 9mm cartridge found in Maria Berry’s Mazda automobile; (8) error in penalty phase jury instruction on burglary; (9) error in overruling objections to prosecutor’s comments concerning Delhall’s mitigation as "excuses”; and (10) error in numerous improper prosecutorial comments in the penalty phase.

. State v. Arthur, 390 So.2d 717 (Fla.1980) (entiding a capital or life felony defendant to a bail hearing where the State must show that guilt is evident or the presumption great in order to deny bail, and holding that it is in the discretion of the judge whether to grant bail).

. McCrae’s September 5, 2001, affidavit was also read into evidence in the trial of the instant case over defense objection of hearsay.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Clifford is actually a polygraph examiner. Pursuant to a motion in limine, the State was not allowed to disclose the fact that Clifford was a polygraph examiner to the jury.

. Spencer v. State, 615 So.2d 688 (Fla.1993) (reiterating that before pronouncing sentence in a death case, the trial judge shall hold a hearing at which the defendant, his attorney, and the State may present additional evidence and argument concerning the sentence).

. The Court reiterated in McDuffie that “a harmless error analysis is proper,” although *161 error in conducting a Richardson inquiry, even if harmless standing alone, may be reviewed cumulatively with other errors that are found to have occurred. McDuffie, 970 So.2d at 322.

. See also Rodriguez v. State, 919 So.2d 1252, 1271 (Fla.2005) (noting that exclusion of a defense witness is a severe sanction that should be a last resort for extreme circumstances) (citing Tomengo v. State, 864 So.2d 525, 529 (Fla. 5th DCA 2004)).